261 So.2d 364 (1972)
George Oscar PARKER
v.
STATE of Louisiana et al.
No. 8765.
Court of Appeal of Louisiana. First Circuit.
March 13, 1972.
Rehearing Denied April 17, 1972.
*365 David L. Morgan, Jr., New Orleans, for appellant.
*366 Jack P. F. Gremillion, Atty. Gen., and Stanford O. Bardwell, Jr., Asst. Atty. Gen., Baton Rouge, for appellees.
Before BLANCHE, TUCKER and COLE, JJ.
COLE, Judge.
We here consider an appeal by George Oscar Parker, formerly an inmate at the Louisiana State Penitentiary at Angola, who seeks damages for personal injuries sustained in a knifing incident at that institution. Named as defendants are the State of Louisiana through the Department of Corrections and various officials and administrators of that prison and the State of Louisiana.
The occurrence precipitating this action took place on September 15, 1969, while Parker was a medium security prisoner at Camp H of that institution. At approximately 4:45 A.M. on that morning, the plaintiff, while asleep, was attacked by one Willie Edmonson, also known as Willie McCoy, with a knife, some sixteen inches in length. Edmonson, also a medium security prisoner who lived in the upstairs section of the Camp H colored barracks, on that morning came downstairs from his living area through a door to the outside left unlocked by inmate guard Richard Knox for the morning kitchen workers, entered the downstairs living area of that same barracks, sought Parker out and stabbed him three times in the mid-section of the body, thus inflicting grave injuries upon him.
By pre-trial order, counsel resolved many of the factual issues ordinarily before the Court and they are, as follows:
1. Plaintiff was stabbed on September 15, 1969, while an inmate confined in Section H, Louisiana State Penitentiary at Angola, Louisiana.
2. Plaintiff was paroled from the penitentiary on September 21, 1969, by virtue of good time behavior (Act 426 of 1964).
3. Plaintiff was stabbed while in his bunk asleep at approximately 4:45 o'clock A.M. by inmate Willie Edmonson.
4. The knife used by Edmonson was approximately sixteen inches in length and made within the confines, or homemade within the confines of the penitentiary.
5. Prior to being confined at Angola, plaintiff's last place of employment was Brennan's Restaurant in New Orleans, and he was employed as a busboy at a minimum salary of $1.50 per hour.
6. As a direct result of the stabbing incident of September 15, 1969, plaintiff was hospitalized in Earl K. Long Hospital at Baton Rouge, Louisiana, from 9/15/69 to 11/19/69.
7. Plaintiff is presently and has been since his release from Earl K. Long Hospital the recipient of welfare from the Louisiana Department of Public Welfare in the amount of $66.00 per month, plus Federal food stamps of $24.00 per month, all of which is based upon the Department's computed need of $103.00 per month.
8. As of May 10, 1971, plaintiff is unemployed.
9. Inmate Willie Edmonson was disciplined on October 9, 1967, for cutting inmate Shelton Batiste.
10. On January 26, 1968, Edmonson was disciplined for hitting Shelton Batiste with a brick.
11. On December 17, 1968, Edmonson was assigned to CBB-LD for administrative investigation involving the cutting of inmate Robert Bradley on December 16, 1968.
12. On September 15, 1969, Edmonson stabbed plaintiff, George O. Parker.
13. Edmonson was disciplined on December 2, 1970, for fighting with inmate Curtis Dandridge. Both inmates had a knife.

*367 14. Homemade weapons are a constant problem because of the shortage of supervision and the open dormitories that the prisoners live in. In spite of constant shakedowns, inmates do manage to fashion weapons from scrap iron and other materials.
15. Inmates are given body searches upon their return to the Camp H compound fenced area.
16. Periodic searches of inmates' barracks for contraband or weapons are conducted.
17. Primarily, homosexuals are assigned to Camp H.
Parker's action against the various defendants herein is grounded upon their alleged negligence or that of their subordinates in leaving a certain door unlocked at a critical time, in not providing adequate internal security measures to prevent such an incident and in their failure to relocate the plaintiff or to take other precautionary measures to better insure his safety, they having been allegedly put on notice that his life was endangered by Edmonson's presence in close proximity to him.
In addition to the above stipulations, certain other facts seem to be undisputed. Camp H is a custodial area divided into minimum and medium security compounds and they are further divided into caucasian and negroid areas. It is also the area of the prison in which all of the so-called passive homosexuals are confined. On January 23, 1968, Parker was condemned to Angola as a parole violator. He was assigned to Camp H as a medium security prisoner and because he was a homosexual. Edmonson was also an inmate of Camp H with similar tendencies. In the months that followed, a relationship arising out of their propensity for sexual deviation was established between the two. The knifing incident was directly attributable to some breakdown in this pathetic alliance.
Subsequent to trial on the merits, the district judge rendered judgment rejecting the demands of plaintiff and dismissing his suit. He found that the plaintiff had failed to satisfy the requirements established by this Court in St. Julian v. State, 98 So.2d 284 (1st Cir. 1957), in which this observation was made:
"The general rule gathered from the cases is that in order to hold the State or the employees of a state who have charge of a prison liable for injury to one inmate inflicted by another inmate, there must be knowledge on the part of such officers in charge that such injuries will be inflicted, or good reason to anticipate such, and following that, there must be a showing of negligence on the part of these officials in failing to prevent the injury. Stephens v. Conley, 48 Mont. 352, 138 P. 189; Kusah v. McCorkle, 100 Wash. 318, 170 P. 1023, L.R.A. 1918C, 1158; Ratliff v. Stanley, 224 Ky. 819, 7 S.W.2d 230, 61 A.L.R. 566; Riggs v. German, 81 Wash. 128, 142 P. 479; Gunther v. Johnson, 36 App. Div. 437, 55 N.Y.S. 869."
An examination of that case indicates that a judgment for an inmate's survivor was rendered where the inmate had been stabbed to death after having been placed in a cell with a prisoner suffering from one of the violent forms of insanity, of which condition the prison officials were aware for some two weeks prior to the killing, and where it was also known by those officials that the existence of dangerous weapons among the inmates was widespread. Crucial to a determination of the case at bar is whether the prison officials had good reason to anticipate the injury to Parker, and if they should have anticipated such, were they negligent in preventing it.
From the stipulations of fact alone, we can easily conclude that Parker had good reason to be afraid of Willie Edmonson. Edmonson has compiled a record while in Angola which reasonably demonstrates that he is a dangerous person who is a menace not only to society at large, but to those immediately around him. Stabbings and *368 other acts of violence seem to be commonplace with him. Yet, Associate Warden Hayden Dees testified that he was no worse than many other inmates at Camp H and that worse prisoners than he were confined there in medium security. Warden Murray D. Henderson was asked if, considering his record, Edmonson should have been living in a Camp H dormitory with other prisoners on September 15, 1969. He replied (Tr. 197), "I think it was in keeping with the type of prisoner that we had confined to that particular area." Indeed, as stated by Warden Henderson, there are only three hundred and forty-one single cells in the whole prison and a prison population of some thirty-seven hundred, which necessarily prohibits the use of a single cell for every dangerous man in confinement.
We are also cognizant of the prevalence of weapons among the inmates. Homemade knives and clubs seemingly abound and are constantly being manufactured by the prisoners. Constant inspections or "shakedowns" are performed by the prison officials, but, by their own testimony, do little good. The record reflects that this is a problem common to all penal institutions. Deputy Warden Lloyd W. Hoyle explained the measures taken in September, 1969, to cope with the problem:
"Well, I can't tell you for sure, but I know that even with the shortage of personnel that we had at that time that a lot of our shift captains volunteered their time and services to shake-down camps and dormitories and everything else, trying to prevent this type of thing... And I've even participated in those myself on nights and weekends to try to help with the problem ... Anything that's laying loose, or anything that's not bolted down and secured is a possible weapon in a penitentiary ... Oh there's millions of ways. I've seen them rub steel on concrete and rocks and everything else. It's it's a tedious chore, but a tedious chore doesn't bother these men." (Tr. pp. 222, 223.)
The plaintiff, without doubt, had a genuine fear for his personal safety; that fear was of Willie Edmonson, and it was reported by him to several guards and to administrative personnel at Camp H on numerous occasions. Inmate guard Richard Knox related that the afternoon before the knifing took place, Parker approached him with the same complaint and requested that he be moved. Knox conducted a "shakedown" of Edmonson's dormitory area without finding a knife. He then reported Parker's complaint to the correctional officer on duty, Richard Ducote, who also conducted a search of Edmonson's area but without success. Sgt. Milton Davis and Captain Albert Couvillion were also aware of Parker's fear of Edmonson. We must conclude, therefore, that the supervisory personnel here involved were on notice that the eventual victim felt that he was in danger and should be moved from the area and that this notice was served upon them on several occasions prior to the occurrence of the injurious event.
However, it is important to distinguish a knowledge on the part of prison officals of Parker's fear of Edmonson from a knowledge on their part, grounded upon reliable facts, that injuries will be inflicted or that there is good reason to anticipate the infliction of injuries. While the former has been established in this case, only the latter is an indispensable element of plaintiff's case which must be established by a preponderance of the evidence before he can recover. The expressions of fear must be viewed in the atmosphere in which they were presented before they can be used as a basis of knowledge that harm was imminent. Prisoners afflicted with homosexual tendencies are a constant source of difficulty for prison officials. Their presence among ordinary prisoners is a disruptive influence, to say the least. They are assigned to one camp to prevent the worsening of a generally tense, overcrowded and unruly situation. These prisoners are, in many instances, emotionally disturbed in addition to their sexual perversion. The *369 record reflects that those in charge of Camp H are confronted, on a daily basis, with petty quarrels, jealousies, trivial bickering and, indeed, reported threats of violence. Rumors run rampant within the confines of the camp and the officials necessarily, in time, become skeptical of each reported probability of trouble. Most reports received by them of such probable occurrences are unfounded, as indicated by the fact that Camp H had only two stabbings other than this one in all of 1969.
It is quite likely that the best index to understanding the context and orientation from within which a decision had to be made by prison officials based upon the probability of harm to plaintiff is found in the testimony of Lemuel Rudolph Lockett, an inmate occupying the bunk next to plaintiff and a person alluded to as the third party in a possible love triangle. Lockett knew both Parker and Edmonson well and was perhaps in a better position than anyone to evaluate the possibility of an attack. Certainly, he had access to inside information and was in a better position than a guard or prison official to know what was about to take place, if anything. Parker had confided in Lockett, had repeatedly told him of his fear of Edmonson. Lockett knew of Edmonson's affinity for knives and of his past record of violence. He had been present, according to him, on a couple of occasions when Edmonson had threatened to stab Parker. Yet, as regards the possibility that Edmonson might actually stab Parker, Lockett deposed: (Plaintiff-12, pp. 10, 22, 23)
"... I ... you know, like I say, I didn't pay it too much mind, wasn't no. . you know, I had seen before, you know, `cause, you know, I seen other incidents similar to it, you know, that ain't never led into nothing as far as serious, you know, I mean anybody getting hurt, you know; but I didn't, you know, give it no thought. .. I never did imagine it would be as serious as that, you know.. . Well, there was some seriousness in the things that were said, you understand, but this is what I'm saying, you understand, I didn't think that it would go as far as it did, like a person might say something, you understand, well, they might be feeling this way at this time, you understand, just through something else causing them to feel that way, you know; but this is just a temporary frame of mind."
The trial court found that the plaintiff failed to show knowledge, actual or constructive, on the part of prison officials that he was about to be seriously injured by Edmonson. We concur. Certainly, the trial court has not committed manifest error. The test of liability involves not knowledge of fear on the part of an inmate but either direct knowledge that injuries will be inflicted, or such knowledge as will give one good reason to anticipate the infliction of injuries. St. Julian v. State, supra. The trial court properly applied the test. It must be remembered that Parker, as were all of these men, was a man possessing violent tendencies, as he originally was incarcerated in Angola on a manslaughter charge arising out of the fact that he stabbed to death a male paramour. This man's fear in September, 1969, is understandable. His fear does not, however, equate to requisite knowledge on the part of the defendants.
With respect to a showing of negligence on the part of prison officials in failing to prevent the injury, the plaintiff relies basically on the three propositions heretofore briefly mentioned. Firstly, it is asserted that inmate Gordon Knox negligently failed to relock the door which locked in the upstairs prisoners thus preventing Edmonson from having the opportunity to attack Parker while sleeping. Secondly, having knowledge of the alleged trouble between the two, it was negligence not to remove either Parker or Edmonson from Camp H thereby preventing the attack. Thirdly, the defendants, according to plaintiff, did not provide adequate internal security measures. The Court will take these matters up in the order recited.
*370 We find, as did the trial judge, that the function of the door was not to keep prisoners away from one another, but was to lessen the opportunity for escape during the nighttime hours (Tr. pp. 322, 323). Knox opened the door for the kitchen personnel and left it open so that they could wash up before the day's work. It was customary for these early risers to return to their living area upstairs and then descend again for their assigned duties. That Edmonson seized upon this particular opportunity to attack does not impute actionable negligence to Knox or his superiors. We are also aware of the cases of Trahan v. State, Through Dept. of Institutions, 158 So.2d 417 (La.App. 3rd Cir. 1963) and Dauzat v. Crites, 237 So.2d 697 (La.App. 4th Cir. 1970) which stand for the proposition that a master-servant relationship does not exist between an inmate guard or trusty and the state and that the negligence of one in that status is not imputable to the state or its paid officials. We find no need to reach that question here, however, as Knox's actions did not amount to negligent conduct.
A more serious consideration is the failure of defendants to transfer Parker from Camp H at his request (or, alternatively, to remove Edmonson therefrom). It must be remembered that it was the application of foresight, not hindsight, that was called for by the prison officials. The prevailing conditions and environmental factors attendant to decision making have already been set forth by us. It was within that framework that the decision not to transfer was made. Warden Henderson testified (Tr. 209): "Well, I think this has to be a value judgment that the man makes on the job." Considering all circumstances, the decision made in this respect is not tantamount to negligence. A reasonable man at that time and place may well have exercised judgment in the same manner.
Bearing on the question of failure to transfer and thus separate the plaintiff and Edmonson is the nature of those confined to Camp H and the inadequacy of facilities at Angola. Records of several Camp H inmates selected at random were introduced into evidence. They establish the validity of the views expressed by Dees and Henderson to the effect that Edmonson and Parker were not unlike the average Camp H domiciliary. The net effect, of course, is that protective physical facilities are grossly inadequate to even begin taking care of the number of persons involved. The record reflects that there is a constant shifting of inmates in an attempt to accommodate the many problems. It appears that the prison officials are making reasonable efforts to advisedly use the facilities that are available to them.
Again, we find no negligence on the part of the officials and administrators of the camp or the prison in failing to move Parker at his request. In view of everything perceived, they could reasonably conclude that he was in no imminent danger necessitating such action.
Assuming, arguendo, that negligence should be assigned to those in charge for not transferring plaintiff, we think it is clear that plaintiff would still be unsuccessful in the prosecution of this particular phase of his case, as we find that he would be contributorily negligent under the circumstances prevailing. Sgt. Davis, a Camp H correctional officer at the time of this incident, positively testified that the plaintiff could have forced his own removal by refusing to go to work or by stepping out of line and refusing to come back into the compound yard at the end of a day's work. Either of these actions would have automatically forced his removal to a more secure lock-up area. Sgt. Davis' testimony also leads to the conclusion that if the plaintiff had really felt that an attack was imminent, some affirmative action or protest on his part could have insured his removal. At page 320 of the transcript, we find this colloquy:
"Q Did Parker ever make such a move in your shift?
A Not that I know of, not when I was on duty.

*371 Q Did he ever make such a refusal to work?
A No, sir.
Q What you're saying, I think is, had he been in fear of his life, he could have taken some steps to get himself out of there?
A He could have."
Not having done so, the plaintiff was guilty of contributory negligence sufficient to bar his recovery herein based on the failure to transfer either him or Edmonson from Camp H. We have considered the argument by plaintiff that affirmative action on his part would have resulted in the loss of "good time". This is somewhat contradicted by the record (Tr. 324) but even if such were true, it is undeniably better to lose "good time" than one's life or suffer serious injuries.
We find no merit in plaintiff's contention that it was actionable negligence for defendants not to provide more adequate internal security measures with which to protect him. Admittedly, there was at the time of this incident inadequate personnel and physical facilities with which to afford inmates of Angola the protection to which they are ideally entitled. The record is more than sufficient to establish that fact. No attempt was made to deny it by anyone who testified.
The thrust of this position taken by plaintiff is grounded in socio-economic theory that organized government owes a duty to provide as much money as is necessary to afford prison inmates absolute protection to prevent the type of thing that here occurred. However, only reasonable protection must be provided prison inmates and this is necessarily correlated to the availability of public resources. When a law abiding citizen becomes the victim of crime, we would not doubt his lack of a legal cause of action were he to bring suit against the state and its political subdivisions based on alleged negligence in not providing enough police officers to see that each individual is protected at all times. Certainly, no greater duty of care is owed to prison inmates. One must distinguish between protection that is so inadequate as to amount to negligence and the economic inability of the state to provide the ideal penalogical security measures. The latter aspect of the problem directs itself to our legislative and executive branches of government. As this Court observed in Stevens v. State, Through State Department of Hospitals, 255 So.2d 621 (1971); writ denied, La., 256 So.2d 638:
"... It is almost common knowledge that our institutions of this nature are not what they ought to be.
"... The purpose of the court is not to evaluate the failure or the alleged failures of the legislative and executive branches of our state government to meet the needs of the people.
"The court, in this instance, is confined to make a finding as to whether this inadequacy, if it existed, constituted negligence..."
The plaintiff in this case is not unlike Stevens, supra, in urging that liability be assessed, at least in part, upon the inadequacy of personnel and physical facilities which, in turn, is directly attributable to insufficient public support. However, as a part of organized society, the plaintiff bears a share of the blame for not contributing to a solution of the problem.
Finally, it may again be noted that an attempt was made to provide the plaintiff with the resources available when he expressed his fear the evening before the stabbing. Both the inmate guard and the correctional officer conducted searches in an attempt to ascertain if Edmonson had a knife or other weapon with which he could attack plaintiff. Their searches were fruitless but they represent a reasonable effort to provide the plaintiff with protection.
For the assigned reasons, the judgment of the district court is affirmed. Plaintiff-appellant *372 is to pay all costs of these proceedings.
Affirmed.
BLANCHE, Judge (dissenting).
I respectfully dissent.
Both the trial court and the majority have committed manifest error in failing to conclude that plaintiff established constructive knowledge that he was likely to be injured by another inmate as required by St. Julian v. State, 98 So.2d 284 (La.App. 1st Cir. 1957). The majority acknowledges that from the stipulations alone the dangerous propensities of Edmonson were well known and plaintiff had good reason to be afraid of him. The opinion states:
"* * * Edmonson has compiled a record while in Angola which reasonably demonstrates that he is a dangerous person who is a menace not only to society at large, but to those immediately around him. Stabbings and other acts of violence seem to be commonplace with him." (pp. 367, 368)
The opinion further states:
"The plaintiff, without doubt, had a genuine fear for his personal safety; that fear was of Willie Edmonson, and it was reported by him to several guards and to administrative personnel at Camp H on numerous occasions." (pp. 367, 368)
It is no mitigating circumstance to me that he was no worse than many other inmates at Camp H and that worse prisoners than he were confined there in medium security when all the circumstances of the case are taken into account. Nor do I find it mitigating that shakedowns are regularly conducted for search of weapons when it is admitted that they do little good. I do not find it an acceptable excuse for not moving plaintiff and his assailant away from each other that there were only 341 single cells in the whole prison and a prison population of some 3,700. The majority has stated:
"Bearing on the question of failure to transfer and thus separate the plaintiff and Edmonson is the nature of those confined to Camp H and the inadequacy of facilities at Angola." (p. 370)
It is unthinkable that the inadequacy of prison facilities and the shortage of personnel could absolve the State from liability of the kind here asserted. The State is responsible for the safety of prisoners, and the highest degree of care is called for when it is taken into consideration the nature of persons so confined and that those so confined are deprived of their normal power of self-protection. As custodian of plaintiff's person and responsible for his safety, the plaintiff has shown and the defendant has admitted the inadequacy of its facilities and personnel to fulfill this duty. Accordingly, the failure to provide adequate facilities and personnel to prevent prisoners from obtaining and possessing dangerous weapons or controlling their activities with adequate personnel to prevent injuries such as here sued upon is, in my opinion, actionable negligence. Such a holding would not make the State the insurer of prison inmates but would require it to exercise due care to protect prisoners in its custody from sexual or other physical assaults and especially while sleeping.
Lastly, I disagree with the majority's having found the plaintiff guilty of contributory negligence because he failed to commit a breach of prison discipline in order to automatically force his removal to a more secure lock-up area. Simply stated, the State, in my opinion, in the instant case failed to use reasonable care to protect plaintiff from the injuries which he suffered when it had good reason to anticipate and should have anticipated that Edmonson might inflict injury on the plaintiff and having such knowledge failed to take reasonable measures to prevent such injury.