281 So.2d 131 (1973)
Jerry Lee NEDD
v.
STATE of Louisiana, Through the DEPARTMENT OF INSTITUTIONS.
No. 52073.
Supreme Court of Louisiana.
June 11, 1973.
Rehearing Denied August 20, 1973.
Law Offices of Steven R. Plotkin, Owen J. Bradley, New Orleans, for plaintiff-appellant.
William J. Guste, Jr., Atty. Gen., Stanford O. Bardwell, Jr., Ass't Atty. Gen., for defendant-appellee.
DIXON, Justice.
Jerry Lee Nedd brings this action for damages for injuries suffered at the hands of a fellow inmate in the Louisiana State Penitentiary.
There was judgment rejecting plaintiff's demand in the trial court, which was affirmed by the Court of Appeal. 255 So.2d 492.
Nedd's claim for damages is based on the failure of the State to keep him separated *132 from McKinley Peterson, the man who injured him. In 1958, Nedd was injured in Angola in an attack by another inmate. While he was lying in his bed Nedd was struck in the head with a piece of pipe. Nedd did not see his assailant. However, McKinley Peterson pleaded guilty to the aggravated battery and received a sentence of five years.
Nedd and Peterson were in and out of jail and prison from 1958 until Nedd returned to Angola in 1967. Nedd contends that he was afraid that McKinley Peterson, resentful for having received an additional five years as a result of the 1958 battery, would do additional harm to him if the opportunity arose. Nedd testified that he learned Peterson's location upon arriving at Angola in February, 1967, and requested, before the classification board, that he be sent to a different camp.
The classification board did not have before it a record of the 1958 incident. The evidence is conflicting concerning what Nedd told the classification board. Nedd contends that he informed the board of his fear of Peterson. His testimony is not supported by other witnesses.
Nevertheless, Nedd was not assigned to the same area where Peterson was located.
Subsequently, in November of 1967, Nedd was transferred to the same camp where Peterson happened to be located. Nedd contends that upon learning of his impending transfer, he attempted to talk with Major Bryan, chief of security. But Nedd himself admitted that he did not explain to Major Bryan the reason for his fear, and was told that he must go where he was sent.
The only witnesses called by the plaintiff were Major Bryan on cross-examination and Nedd himself. Nedd testified that there had been no communication between him and Peterson between 1958 and January 27, 1968, the day of the altercation with Peterson. The only reason he expressed for fearing Peterson was the natural (in Nedd's opinion) resentment Peterson would feel for having received a five year sentence for his attack upon Nedd nine years earlier.
The only basis for Nedd's claim against the State is its failure to separate him from Peterson. If we assume that the State, through its officials at the Louisiana State Penitentiary, should have known everything Nedd knew (Nedd's fear and the reason for his fear) we cannot hold that the State would have been under an obligation to separate Nedd from Peterson.
The evidence in this record does not establish a reasonable basis for placing prison officials on notice that Nedd was in danger from Peterson. The record before us establishes that fights occurred at the penitentiary on a daily basis; knifings, cuttings and stabbings on a weekly basis; that frequently, some men who have fought, cut and stabbed each other later live harmoniously in the prison population. Major Bryan testified that if he had known what Nedd said he told the classification board, he would not necessarily have separated Nedd and Peterson.
In addition, the record before us is wholly insufficient to establish Nedd's contention that he was attacked without provocation by Peterson, motivated by revenge for the five year sentence after the 1958 attack.
Nedd was an habitual offender. Almost all of the testimony he gave was contradicted. Other evidence in the record, just as believable as Nedd's testimony, indicates that the altercation was not an unprovoked attack by Peterson. Other evidence also indicates that Nedd and Peterson had been together frequently during the years that intervened between the first attack and the last. For several months they were in the Orleans Parish prison. There is evidence that they played cards together in the parish prison and in the penitentiary. There is evidence that Nedd stabbed Peterson in the shoulder just a few weeks before the altercation of January 27, 1968, and had *133 argued with him for more than thirty minutes on the day of the fight.
Nedd claimed that he was attacked without cause by Peterson, who was wielding a cane knife. Nedd claims that he lost some fingers in an effort to defend himself with a bed board. Peterson and another convict witness testified that Nedd started the fight, cutting Peterson in the hand without provocation. Four convicts were involved in the altercation. All four were cut.
It is not possible to tell where the truth lies from this record.
The Court of Appeal was correct in its conclusion that plaintiff failed to establish that the State had abrogated the standard of care incumbent upon it for the protection of prisoners in its custody.
For these reasons, the judgment of the Court of Appeal is affirmed at plaintiff's cost.
BARHAM and TATE, JJ., dissent and assign written reasons.
BARHAM and TATE, Justices.
We respectfully dissent.
Essentially, we feel that the record indicates that the state knew, or should have known, of the great danger of harm to which the plaintiff Nedd was exposed by being placed in unguarded proximity to the vengeful Peterson, his assailant. Peterson had earlier been sentenced to an additional five years in the penitentiary for an earlier physical attack upon Nedd.
Aside from Nedd's repeated attempts to secure separation from Peterson, the danger to Nedd was, or should have been, obvious. The state should not be able to exculpate itself from liability to inmates upon a claim of ignorance of facts of which it should be aware. (No more, for instance, than should a railroad be able to exculpate itself from liability for the negligence of its engineer upon his proving he did not know he was exceeding the speed limit in a municipality, or upon the railroad company's claim that it did not know that its engineer did not know the speed limit in the municipality.)
The concept of negligence envisions a departure by one from a uniform standard of behavior which is owed under the particular circumstances to the person who is harmed as a result of the risk caused by the departure from that standard. That standard is an attempt to set as a matter of law an objective rather than a subjective guide, and should apply generally to all. However, we recognize that that standard in a particular case must always be set after a consideration of the risk involved, the apparentness of the risk to the one who creates it, the relationship of the actor and the one harmed, and the particular or peculiar facts and circumstances of the situation giving rise to the risk. Grand Trunk Ry. v. Ives, 144 U.S. 408, 12 S.Ct. 679, 36 L.Ed. 485 (1891); Green, The Negligence Issue, 37 Yale L.J. 1029. The law has created an abstract, ideal reasonable man, and requires all to act as prudently and carefully as would this mythical person under the same or similar circumstances to that class of people of which the injured person is a member. Prosser, Torts, § 32, p. 151 (4th Ed.1971); James, The Qualities of the Reasonable Man in Negligence Cases, 16 Mo.L.Rev. 1. Just as the standard of conduct may be lowered as in the case of an emergency, that standard may be raised because the activity engaged in creates a peculiar relationship or requires special knowledge or skill. See James, supra, at pp. 12-17.
A resolution of whether the law will declare one's actions negligent requires first a determination of the duty of care, if any, which was owed to the one who was exposed to the risk which caused the harm. Salmond, Torts § 80 (Hueston, 14th Ed. 1965); James, General Principles of the Law of Torts, p. 151 (2nd Ed. 1964); Lawson, The Duty of Care in Negligence: A Comparative Study, 22 Tul.L.Rev. 111. *134 Here in particular, we must decide the duty of care, if any, owed by the defendant and its employees to guard against the particular risk of harm to which this plaintiff was subjected. Those who have custody and control over the decisional processes and the freedom of movement of people in an institution, such as the penal institution operated by the defendant, are responsible for their own affirmative acts or omissions which directly result in injury through breach of duty. They may also be responsible for their affirmative acts or omissions to act which allow others in their custody to act negligently or intentionally to cause harm, if the negligent or intentional act of the others occurs because of a breach of duty to the injured party arising out of the relative positions of the custodian and those in custody.
While forseeability is a factor for consideration in determining the scope of the duty of care so as to ascertain whether the defendant's servants have in fact been negligent, other factors must also be considered, for "`the degree of care for the safety of others which the law requires human beings to observe in the conduct of their affairs varies according to the circumstances'". James, General Principles of the Law of Torts, p. 173 (2nd Ed. 1964).
In a penitentiary environment an inmate is severely limited in his means of self-protection and self-control, while the chance of his encountering violence and intentional assaults and batteries is multiplied by the very conditions under which he must live. When a number of persons, many of whom are known to be predisposed to violence, are forced to live together in confined quarters under unnatural conditions, it is not unusual for an explosive situation to develop. The plaintiff-prisoner, one of a special class of persons, and the defendant-authority here have a particular and peculiar relationship not existing between persons in an ordinary community, and therefore whether the scope of duty owed encompassed the risk of the intentional harm here encountered must be determined in the light of this peculiar relationship and these special circumstances.
While imprisonment of one convicted of crime may deprive him of certain constitutional rights as well as other rights and privileges accorded the non-criminal, only those rights necessary for carrying out the public policy of the state as set out in the statutes governing imprisonment of criminals may be curtailed or denied the prisoner. All other rights not expressly or impliedly taken away by statute as a part of the criminal sanction and the correctional process are retained by the prisoner. Freedom of movement, freedom of choice, and the facility for self-protection are essentially denied or at least curtailed under the statutory authority for carrying out the correctional process in Louisiana. Therefore those who have custody over prisoners are under a duty to exercise reasonable care in controlling the conduct of the prisoners to prevent them from intentionally harming one another. The custodians must exercise this care in light of the knowledge of the propensity of those whom they control for inflicting intentional personal injury upon others, and knowledge of the probabilities that because of special circumstances the custodians may be required to protect certain prisoners from intentional wrongs. This does not mean the penitentiary authorities are held accountable for any and all injuries inflicted by one inmate on another. Their accountability is determined by the facts that are within their knowledge or should have been within their knowledge. See 2 Restatement of Torts 2d § 320 (1965).
These general principles of law should be applied to the facts of this case. In this particular case the authorities admittedly knew many of the facts which would have caused a reasonable, prudent man acting in this particular relationship to know of the likelihood of the particular risk which might occur. Other facts should have been known. Of first importance is the fact that Nedd and Peterson had had the previous serious encounter. Major Bryan, *135 chief of security, who was on the classification board, admitted that he probably had independent recollection of this prior encounter. The seriousness of that earlier encounter and injury nullifies any argument that the incident was too remote to be of importance, especially when Nedd, in the early days of his present imprisonment, expressed his fears to the board of classification which included Major Bryan. Although the board was told of the prior encounter and the possibility of a dangerous situation between Nedd and Peterson, no notation appears in the record of either inmate of this serious condition. Moreover, the record keeper testified that Peterson's unprovoked attack upon Nedd in 1958 which almost killed him should have been noted in the records of the classification office. However, the only mention of that affair is a postcard dated 8/11/58, the date of the first incident, from Charity Hospital to the superintendent of Angola saying that Nedd was dangerously ill and that visitors were to be limited. If a proper report of this incident had been in Nedd's file, it would have been included in the admission summary prepared for the classification board when Nedd was returned to Angola in 1967. This would have constituted actual notice to the board of the potential danger in quartering Nedd with Peterson during any time between his entrance and his discharge from the prison. Nevertheless the board and the particular members sitting had actual notice because Nedd reported his fears to them, and they reacted by giving him special quarters when he was classified.
The prison authorities made no investigation at any time into the prior encounter. As the Court of Appeal stated, Major Bryan thought Nedd's first request for not being assigned to Hickory II was merely an attempt "to be assigned to a minimum security camp and [he] did not believe that Nedd was truly concerned about his safety or that the matter required any further investigation". Apparently because many inmates' complaints are without merit and deviously made, prison personnel tend to discount or even disregard valid complaints such as those made by Nedd.
Also to be considered is the conversation between Nedd and Major Bryan just before his assignment to Camp A where the amputation of the fingers occurred. Although the conversation was brief, Major Bryan, with the knowledge previously obtained at the session of the board of classification, should have been on notice to investigate. Major Bryan testified that he did not remember the request from Nedd just before his transfer in 1968 to Camp A where Peterson was then quartered. Nedd testified that he told Major Bryan that he couldn't go over to Camp A because Peterson was over there, and that Major Bryan had responded: "You go where you are sent, not where you want." This appears to be a final unappealable determination by the highest authority, the officer in charge of security. Nedd testified to two other requests for removal from Camp A, one to the doctor when he visited the penitentiary hospital facility and another when he was brought before the disciplinary board. There is nothing in the prison records to support Nedd's testimony, but this is to be expected since the prison records are sparse and especially since the more serious occurrence of 1958 and Nedd's reference to it before the classification board do not appear in the records.
The prison authorities would be charged with constructive notice of the probability of the particular risk to Nedd under the facts and circumstances of this case. However, the prison authorities actually knew of the grave risk that intentional harm would be inflicted by Peterson on Nedd if they were confined together. However, as previously stated, forseeability is not the lone criterion for judging the scope of the duty owed to protect from a risk. Even if it were the only test to be applied to the case at hand, the record supports the conclusion that the risk was forseeable.
*136 The risk encountered by Nedd, that is, the intentional battery where his fingers were severed or injured when Peterson used the cane knife in an attack upon him, is one encompassed within the scope of the duty the prison authorities owed to the inmate Nedd. The prison authorities breached this duty by failing to quarter these inmates separately, by failing to keep proper records, and by failing to investigate. Therefore, the defendant's servants having breached the duty of reasonable, prudent men under the circumstances and facts peculiar to the relationship between the parties, the defendant must respond in damages, for this is negligence.
The Court of Appeal found that "Nedd remained in his dangerous circumstances as much because of his own silence and inaction as because of any alleged failure on the part of the prison personnel". On this finding that court charged him with contributory negligence barring recovery. We do not so conclude under our consideration of the law and the record before us.
It is not probable under the record that any affirmative action by Nedd, through letters or other notice, would have changed the attitude of the prison authorities so that his circumstances would have been changed. As the majority votes, the prison authorities were not seriously concerned with the dangerous circumstances confronting Nedd. The very nature of the operation of the prison requires that any decision regarding placement of prisoners must rest with the prison authorities. With as much actual notice as they had of the circumstances which should have resulted in separation of these two inmates, further notice more probably than not would have availed Nedd little. The defendant cannot shift the responsibility it has for physical placement of the inmate Nedd simply because he finally desisted from complaining of a matter of which they had actual notice. As previously noted, the final authority, the Chief of Security had told Nedd he would go where he was told to go and not where he wanted to go. Persistance did not and would not have availed any change for Nedd. The plea of contributory negligence is without merit.
Within the limited facilities available, the penitentiary administration may have done its best; but this best was not enough to afford adequate custodial safety as demanded by the standards of a civilized society. The state's failure to appropriate adequate monies for the state's institutions to perform their custodial function should not, in this last part of the Twentieth Century, immunize the state from liability to an inmate who is injured through the state's lack of reasonable care in furnishing reasonable safeguards for his physical security while he is in the state's custody and unable to fend for himself.
We therefore respectfully dissent.