282 So.2d 483 (1973)
George O. PARKER
v.
STATE of Louisiana et al.
No. 52404.
Supreme Court of Louisiana.
February 19, 1973.
On Rehearing August 20, 1973.
*484 David L. Morgan, Jr., New Orleans, for plaintiff-applicant.
William J. Guste, Jr., Atty. Gen., Stanford O. Bardwell, Jr., Asst. Atty. Gen., for defendants-respondents.
*485 SANDERS, Justice.
The plaintiff, Parker, seeks reversal of an adverse judgment rendered by the district court and affirmed by the First Circuit Court of Appeal, denying him recovery for a knife-attack by a fellow prisoner at Louisiana State Penitentiary. See La. App., 261 So.2d 364 (1972). We granted certiorari to review the conclusion reached by both lower courts that the failure of the penal authorities to isolate the plaintiff or otherwise prevent the attack did not warrant recovery under the existing circumstances. 261 La. 824, 261 So.2d 230 (1972). After review, we affirm.
No major dispute exists as to the facts. Several important facts have been stipulated; others are reasonably clear from the evidence.[1]
The stipulation and evidence reflect that Parker and Edmonson, his assailant, were classified as homosexuals at the Louisiana State Penitentiary. They were assigned to Camp H, used primarily for homosexuals. Both had records of violence; Parker himself was serving a sentence for fatally stabbing a male paramour.
At one time, Parker and Edmonson had a homosexual relation. A third prisoner intervened and disrupted the relationship. Moved by jealousy, Edmonson threatened the plaintiff.
Once threatened, the plaintiff reported his fears of bodily harm to his keepers on more than one occasion. In response to these reports, Captain Couvillion of the penitentiary staff summoned both Parker and Edmonson to his office, interrogated and counselled them, and, as the trial court found, "felt that they left his office as friends." Weapon searches were conducted regularly.
On the night of September 15, 1969, as a protective measure, the penitentiary employees *486 searched Edmonson and his dormitory area for weapons but found none. Early the next morning, an inmate guard opened the door leading from the second floor of the dormitory to allow the kitchen personnel to come downstairs to bathe before leaving for work. While the door was open, Edmonson also made his exit; he entered the first floor dormitory, in which plaintiff slept, and stabbed him with a 16-inch homemade knife, inflicting serious injuries.
The Court of Appeal found no actionable negligence on the part of the penal authorities and rejected plaintiff's demands. In this Court, plaintiff first contends that LSA-R.S. 15:853 establishes a rule of absolute liability for injuries to prisoners in the custody of the penitentiary.
That statute provides:
"A. The superintendent shall exercise the following powers:
"(1) Subject to the provisions of Subsection B. of this Section, he shall have general management and control over the convicts committed to the penitentiary, their custody, discipline, welfare, and safety. He shall make adequate provision for the segregation of young shortterm first offenders as provided by law."
It is true the statute vests in the superintendent the general management and control of the prisoners, including power to superintend their custody, discipline, welfare, and safety. We fail to detect in the statute, however, any provision making the superintendent absolutely liable for personal injuries sustained during imprisonment. We conclude that such a construction is unwarranted.
The applicable rule has been frequently stated. A penal institution is not an insurer of an inmate against attacks by other inmates. The standard is that of reasonable or ordinary care. The majority rule is that in order to hold the penal authorities liable for an injury inflicted upon an inmate by another inmate, the authorities must know or have reason to anticipate that harm will ensue and fail to use reasonable care in preventing the harm. St. Julian v. State, La.App., 98 So.2d 284 (1957); 60 Am.Jur.2d, Penal and Correctional Institutions, § 17, p. 821 (1972); 72 C.J.S. Prisons § 13, p. 866; Annot., Prison-Assault by Prisoner, 41 A.L.R.3rd 1021, 1028-1029 (1972).
The record in the present case supports a finding that the penal authorities received notice that the plaintiff feared an attack from Edmonson. Such a notice alone, however, is insufficient to support liability under the above rule. Scores of reports of this kind are received weekly in the prison environment. For liability, the law requires at least adequate reason to anticipate harm and failure to take reasonable action to avert it.
Apart from the periodic search for weapons and routine security, the prison authorities here counselled both prisoners. From the conference, the authorities concluded that no harm was intended. The search for weapons was fruitless.
Plaintiff makes three basic charges of negligence. The plaintiff first asserts that Gordon Knox, an inmate guard, failed to keep the door leading from Edmonson's upstairs dormitory locked. The evidence, however, is quite clear, as found by the lower courts, that the purpose of the door was to prevent escape during the nighttime to the outside of the dormitory, not to keep the prisoners apart. The door had to be opened for the early workers to bathe, to return to their quarters, and to leave for their assigned duties. At the beginning of the work day, the movement of prisoners was permissible. The prisoners had access to each other at other times. We conclude that there was no negligence.[2]
*487 The second allegation is that the prison failed to provide a security system sufficient to prevent the acquisition or making of the crude knife, the hiding of the weapon, and the attack itself. The record reflects that the weapon problem is common to all penal institutions. Despite all reasonable precautions, the acquisition of such weapons cannot be completely prevented. As Deputy Warden Lloyd W. Hoyle, explained:
"Anything that's laying loose, or anything that's not bolted down and secured is a possible weapon in a penitentiary.... Oh there's millions of ways. I've seen them rub steel on concrete and rocks and everything else. It's a tedious chore, but a tedious chore doesn't bother these men." (Tr. pp. 222, 223.)
The record reflects that the prison employees made periodic searches for weapons and conducted a fruitless search of the assailant's dormitory area the night before the stabbing. To require more would be tantamount to imposing absolute liability.
The final and more weighty argument is that the prison officials were guilty of negligence in failing to isolate plaintiff or at least place him in separate facilities from Edmonson.
The question is a close one. In essence, however, the plaintiff complains of an error of judgment. The administrative decision against isolation was based upon a satisfactory interview with the prisoners and a fruitless search for weapons. Although by hindsight we now know that the decision was wrong, hindsight is not the test. To the contrary, the decision must be tested by the information, alternative courses of action, and circumstances existing at that time. Testing it on this basis, the trial court found that the failure to isolate did not constitute negligence.
In accepting the trial court's findings, the Court of Appeal stated:
"The expressions of fear must be viewed in the atmosphere in which they were presented before they can be used as a basis of knowledge that harm was imminent. Prisoners afflicted with homosexual tendencies are a constant source of difficulty for prison officials. Their presence among ordinary prisoners is a disruptive influence, to say the least. They are assigned to one camp to prevent the worsening of a generally tense, overcrowded and unruly situtation. These prisoners are, in many instances, emotionally disturbed in addition to their sexual perversion. The record reflects that those in charge of Camp H are confronted, on a daily basis, with petty quarrels, jealousies, trivial bickering and, indeed, reported threats of violence. Rumors run rampant within the confines of the camp and the officials necessarily, in time, become skeptical of each reported probability of trouble. Most reports received by them of such probable occurrences are unfounded, as indicated by the fact that Camp H had only two stabbings other than this one in all of 1969."
We find, as did the lower courts, that the steps taken by the authorities which included a conference with the prisoners and a search for weapons, were reasonable under the circumstances. An absolute requirement of isolation or reassignment to avoid liability in such cases would create chaos in prison administration.
We have examined the numerous assignments of error and find no merit in them. Tragically, plaintiff's injury was the product of an environment in which violent, disturbed, and sexually abnormal men are crowded into a single prison unit under conditions that are far less than ideal. As the record shows, no degree of caution can altogether prevent such occurrences.
For the reason assigned, the judgment of the Court of Appeal is affirmed.

*488 BARHAM, J., dissents.
TATE, J., dissents and assigns written reasons.
TATE, Justice (dissenting).
I agree with the excellent dissent of Judge Blanche in the court of appeal. 261 So.2d 364, 374. As he there stated, 261 So.2d 372:
"It is unthinkable that the inadequacy of prison facilities and the shortage of personnel could absolve the State from liability of the kind here asserted. The State is responsible for the safety of prisoners, and the highest degree of care is called for when it is taken into consideration the nature of persons so confined and that those so confined are deprived of their normal power of self-protection. As custodian of plaintiff's person and responsible for his safety, the plaintiff has shown and the defendant has admitted the inadequacy of its facilities and personnel to fulfill this duty. Accordingly, the failure to provide adequate facilities and personnel to prevent prisoners from obtaining and possessing dangerous weapons or controlling their activities with adequate personnel to prevent injuries such as here sued upon is, in my opinion, actionable negligence. Such a holding would not make the State the insurer of prison inmates but would require it to exercise due care to protect prisoners in its custody from sexual or other physical assaults and especially while sleeping."
I therefore respectfully dissent.

ON REHEARING
MARCUS, Justice.
This is a suit for damages by plaintiff, George Oscar Parker, who seeks recovery for injuries inflicted upon him following a knife attack by a fellow prisoner at the Louisiana State Penitentiary at Angola. The plaintiff alleges negligence on the part of the prison authorities in failing to protect him from this assault. Named as defendants are the State of Louisiana through the Department of Corrections and various officials and administrators of that prison and the State of Louisiana. The Court of Appeal concurred in the findings of the trial court that the plaintiff failed to show knowledge, actual or constructive, on the part of the prison officials that plaintiff was about to be seriously injured by a fellow inmate. Further, finding no negligence on the part of the defendants, the Court of Appeal affirmed the dismissal of plaintiff's suit. 261 So.2d 364. We granted certiorari upon the application of plaintiff. 261 La. 824, 261 So.2d 230. After hearing, this Court affirmed. Subsequently, a rehearing was granted. We adhere to the views expressed in our original opinion.
It is undisputed that this knife attack upon Parker occurred on September 15, 1969 at approximately 4:45 a. m. while he was asleep in a portion of the prison known as Camp H and that the attack was made by another inmate, Willie Edmonson, also known as Willie McCoy. He stabbed Parker with a homemade sixteen-inch knife. This resulted in severe injuries to the plaintiff.
The issues involved in this case are whether the prison officials had actual or constructive knowledge that Parker was about to be seriously injured by Edmonson; whether there was reason to anticipate such danger; and, if so, whether the prison authorities were negligent in failing to take steps to prevent the ensuing injury either by lack of security measures or in failing to isolate Parker from Edmonson.
Parker contends that he transmitted his fear of bodily injury from Edmonson to the prison officials on numerous occasions, even the night before the attack when he contends Edmonson displayed a knife to him and threatened his life. Parker urges that the failure to take precautionary measures to keep Edmonson away from him and to provide for his safety renders the defendants liable under the ruling in St. Julian v. State, 98 So.2d 284 (La.App. 1957). He additionally seeks the imposition of absolute *489 liability under R.S. 15:853[1] for injuries to prisoners in the custody of the penitentiary.
It is urged by the defendants that there was neither knowledge on the part of the prison officials that Edmonson would inflict bodily harm on Parker nor reason to anticipate such, and that no negligence existed on their part in any respect. They deny that they are the absolute insurers, under the law, for the safety of prisoners in their custody at the penitentiary.
We stated, on original hearing, that the stipulation and evidence reflects that Parker and Edmonson were homosexuals who were assigned to Camp H, a compound used primarily for homosexuals. Furthermore, the inference is clear from the record that Parker and Edmonson had engaged in abnormal sexual relations with each other.
It is evident that the atmosphere at Camp H was one where there was constant bickering and arguing among the inmates which often resulted in fights and threats of bodily harm against one another. The prison officials testified that complaints of this nature were routine and constant. While these complaints were often couched in terms of fear of bodily harm, there was generally no basis for these apprehensions. Normally, these complaints were checked out, and meetings set up so that the parties might amicably iron out their differences. There is no doubt that both Parker and Edmonson had made such complaints to the prison officials. On two such occasions, Parker made complaints concerning difficulties with Edmonson to Capt. Couvillion and Sgt. Milton Davis. Meetings were arranged with the parties by these officials, who thereafter concluded that the difficulties had been worked out and that there was no danger involved. It is clear that neither of these meetings formed a basis for these officials to anticipate bodily harm in the future to either of these parties. Much is made of the fact that Edmonson had a record showing vicious propensities, but a sampling of the dossiers of other men in this compound introduced in the trial court indicated that all of these inmates, more or less, have the same or similar records. Consequently, there was no more cause for concern for Parker's safety than for any other prisoner housed in this section of the prison. For that matter, Parker himself was in the penitentiary after conviction for manslaughter stemming from the killing by him of his male paramour.
It should be pointed out that numerous homemade knives were constantly discovered by prison officials. In order to combat this situation, periodic shakedown inspections were made. Accordingly, when Parker complained to an inmate guard on the night before the attack that Edmonson had displayed a knife to him and threatened him, Edmonson was immediately searched, but no weapon was found.
As observed in our original opinion, the weapon problem is common to all penal institutions. Despite precautionary measures, the acquisition of such weapons cannot always be prevented. Accordingly, we cannot ascribe any negligence to the defendants herein in this regard since they did everything they could reasonably be expected to do under the circumstances.
Our primary concern in this case under consideration is whether there was reason for the prison officials to have knowledge that Edmonson would stab Parker and whether they should have anticipated the injury which actually occurred on September 15, 1969. We think not. True, complaint had been made. However, the test is not the mere complaint of such danger. There must be reason to believe that the threatened harm to this prisoner is real and actual and sufficient to place prison officials on notice to act in order to prevent it.
*490 Our conclusion, from a thorough review of the record, is that there was no actual or constructive knowledge on the part of the prison officials that Edmonson would do bodily harm to Parker, nor was there reason to anticipate Edmonson's action. The complaints and fears were not grounded on unusual danger to this particular prisoner, the fears being those generally voiced and felt by the prison population at large in this particular portion of the prison.
In arriving at these conclusions, we must bear in mind the circumstances involved. We are dealing here with violent, disturbed and sexually abnormal men who are crowded together in a confined section of the prison under conditions which are far from ideal. Within this atmosphere, the prison officials must evaluate the constant complaints which are made to them by the prisoners. Specifically, Parker's complaints did not present anything of an unusual nature. This is borne out by the testimony of Edmonson who admitted that, during his arguments with Parker, they would threaten each other, but added that these were just routine among homosexuals. Also, L. R. Lockett, who bunked next to Parker in the dormitory and a person alluded to as the third party in a possible love triangle, admitted knowledge that Edmonson had threatened to stab Parker on a couple of occasions, but said that he did not pay any attention to these threats because they are quite common and never taken seriously. He added that, normally, people do not get hurt. Accordingly, if some of the parties involved considered these threats to be normal and usual under the circumstances, it would certainly be unreasonable to conclude that the prison officials should have considered them otherwise.
We cannot judge the actions of the prison officials by hindsight. Apparently, their judgments in such matters have been quite accurate in the past. The record reveals that there had been only two stabbings at Camp H prior to the one involved in this case. To hold the prison officials negligent, on the few occasions where the complaints developed into reality, would be unjust and harsh and a deviation from the reasonable man test.
Parker further seeks to attribute negligence to defendants for allowing the door to the downstairs portion of this complex to remain open, thus making it possible for Edmonson (who was quartered upstairs) to come down to the room of Parker. It is contended that this door was kept locked and a guard was to be posted at its entrance when it was opened. The inference is that, if the guard had been present when Edmonson came through, instead of in the kitcken drinking coffee, the unfortunate event might have been avoided.
However, the door was always opened at this time of the morning to allow free passage for the inmates to report to work in the kitchen, and it remained open for the remainder of the day until the inspection at night, when it was again locked to insure that no prisoner would escape. It mattered not where the guard was at the time Edmonson came down to Parker's quarters, as it is evident from the record that his absence was of no consequence in the happening of the events which followed.
We find no reason, under the facts and circumstances presented, to conclude that the plaintiff established negligence on the part of the defendants.
As in our original opinion, we reject the contention that the defendants are absolute insurers of the safety of every individual confined in a penal institution under the provisions of R.S. 15:853. Nothing in that statute intimates such a postulation.
Absent a finding of actual or constructive knowledge on the part of the prison officials of an unusual danger (apart from the usual fear and complaint so often evidenced by this type of prisoner in this portion of the prison complex), reason to anticipate the danger imparted by such knowledge, and negligence in preventing the injury from this particular danger, recovery cannot be allowed against these defendants. The courts below, as well as this Court, properly dismissed plaintiff's suit.
*491 In a somewhat similar factual situation presented in our recent decision in Nedd v. State of Louisiana through Department of Institutions, 281 So.2d 131, handed down on June 11, 1973, we held that the record did not establish a reasonable basis for placing prison officials on notice that a plaintiffinmate was in danger from another inmate; nor did it establish that the State had abrogated the standard of care incumbent upon it for the protection of prisoners in its custody. The record in the instant case warrants the same conclusions.
For the reasons assigned, the judgment on original hearing, which affirmed the judgment of the Court of Appeal, is reinstated and made the judgment of this Court. Plaintiff is to pay all costs.
CALOGERO, J., concurs.
TATE, J., dissents for the reasons assigned in dissent on original hearing.
BARHAM, J., dissents for reasons assigned in the dissent on original hearing.
DIXON, J., dissents.
NOTES
[1] The stipulated facts are as follows:

1. Plaintiff was stabbed on September 15, 1969, while an inmate confined in Section H, Louisiana State Penitentiary at Angola, Louisiana.
2. Plaintiff was paroled from the penitentiary on September 21, 1969, by virtue of good time behavior (Act 426 of 1964).
3. Plaintiff was stabbed while in his bunk asleep at approximately 4:45 o'clock A.M. by inmate Willie Edmonson.
4. The knife used by Edmonson was approximately sixteen inches in length and made within the confines or homemade within the confines of the penitentiary.
5. Prior to being confined at Angola, plaintiff's last place of employment was Brennan's Restaurant in New Orleans, and he was employed as a busboy at a minimum salary of $1.50 per hour.
6. As a direct result of the stabbing incident of September 15, 1969, plaintiff was hospitalized in Earl K. Long Hospital at Baton Rouge, Louisiana, from 9/15/69 to 11/19/69.
7. Plaintiff is presently and has been since his release from Earl K. Long Hospital the recipient of welfare from the Louisiana Department of Public Welfare in the amount of $66.00 per month, plus Federal food stamps of $24.00 per month, all of which is based upon the Department's computed need of $103.00 per month.
8. As of May 10, 1971, plaintiff is unemployed.
9. Inmate Willie Edmonson was disciplined on October 9, 1967, for cutting inmate Shelton Batiste.
10. On January 26, 1968, Edmonson was disciplined for hitting Shelton Batiste with a brick.
11. On December 17, 1968, Edmonson was assigned to CBB-LD for administrative investigation involving the cutting of inmate Robert Bradley on December 16, 1968.
12. On September 15, 1969, Edmonson stabbed plaintiff, George O. Parker.
13. Edmonson was disciplined on December 2, 1970, for fighting with inmate Curtis Dandridge. Both inmates had a knife.
14. Homemade weapons are a constant problem because of the shortage of supervision and the open dormitories that the prisoners live in. In spite of constant shakedowns, inmates do manage to fashion weapons from scrap iron and other materials.
15. Inmates are given body searches upon their return to the Camp H compound fenced area.
16. Periodic searches of inmates' barracks for contraband or weapons are conducted.
17. Primarily, homosexuals are assigned to Camp H.
[2] Because of our conclusion, we do not reach the question of whether the State is liable for the negligence of prison trusties. But see Dauzat v. Crites, La. App., 237 So.2d 697 (1970); Trahan v. State, La.App., 158 So.2d 417 (1963).
[1] Plaintiff relies upon the provisions of R.S. 15:853, providing that the superintendent shall exercise general management and control of the prisoners and shall have power to superintend their custody, discipline, welfare and safety.