314 So.2d 449 (1975)
Dolores Weathers Breaux, wife of and Irvin BREAUX, Sr.
v.
The STATE of Louisiana et al.
No. 10055.
Court of Appeal of Louisiana, First Circuit.
May 19, 1975.
Rehearing Denied July 9, 1975.
Writ Granted September 26, 1975.
*451 David L. Morgan, Jr., New Orleans, for appellants.
Robert C. Funderburk, Jr., Baton Rouge, for appellees.
Before LOTTINGER, LANDRY, SARTAIN, BLANCHE and YELVERTON, JJ.
LANDRY, Judge.
Plaintiffs, Dolores and Irvin Breaux, Sr., husband and wife, (Appellants), appeal from judgment dismissing their claims for damages for the death of their major son, Irvin Breaux, an inmate of Louisiana State Penitentiary (Angola), who was stabbed to death by fellow inmates on August 11, 1973. We reverse and render judgment in favor of Appellants against the State of Louisiana.
The named defendants are: The State; The Louisiana Department of Corrections (Department); Elayn Hunt, Director of the Department (Director); C. Murray Henderson, Warden, Angola (Warden); Hayden J. Dees, Assistant Warden, Angola; Lloyd W. Hall, Assistant Warden, Angola; Colonel Robert Bryan, Chief Security Officer, Angola; Davis Benoit, Correctional Officer I, Angola; Michael Guillot, Correctional Officer I, Angola; Roland Dupree, Correctional Officer III, Angola; and Joe G. Pittman, Correctional Officer IV, Angola. The trial court rejected Appellants' demands as to all defendants. On appeal, a three judge panel of this Court reversed the trial court, and rendered judgment in favor of plaintiffs against the State, Davis Benoit and Joe G. Pittman, in solido, with one Judge dissenting. In conformity with Louisiana Constitution 1974, Article V, Section 8(B), reargument was had before this panel of five judges.
The basic issue posed is the nature and extent of the duty of care owed by the State and its penitentiary officials to protect inmates of a state penitentiary from injury and death at the hands of fellow prisoners.

THE FACTS
On August 9, 1973, Rance Moore, a youthful (18 year old) prisoner in Angola was released from Angola's Reception Center, into open prison population, after processing and indoctrination as a newly admitted inmate. He was assigned to a dormitory designated as Walnut I, situated in a compound containing four such housing units. When Moore reported to the dormitory, he was immediately beset by several inmates who informed Moore that Moore would be their "woman". An argument ensued among the inmates concerning whose "woman" Moore would be. The matter threatened to erupt into a fight. Moore summoned a guard and requested that he be put in the "hole", solitary confinement, for protection. Moore was taken to solitary. However, instead of being confined alone, he was placed in a cell with two other prisoners who promptly proceeded to threaten him. After a few hours in the "hole", Moore requested permission to return to his dormitory for the night, which request was granted.
Walnut I dormitory consists of a lounge, bathroom and large living area. The lounge contains recreational facilities, including television. From the lounge, access is available to the bathroom which includes showers, toilets and other such facilities. The lounge has double doors opening into the large single sleeping area which contains sixty cots. The beds are arranged in four rows of fifteen cots each, two rows on each side of a wide center aisle. The rows of cots on each side of the center aisle are separated sufficiently to allow passage between them.
*452 Willie Carney and Gilbert Dixon, half brothers, were housed in Walnut I dormitory. Moore spent the first night in the dormitory without incident. The following night, while sitting on his cot, Moore was approached by Carney and Dixon. Moore noticed the other inmates proceeding toward the lounge. Carney asked Moore if he, Moore, wanted to go to the lounge, and Moore answered in the negative. When the sleeping area was cleared of all inmates except Carney, Dixon and Moore, Carney hit Moore and threatened Moore with a knife. Dixon came up and asked Moore if Moore wanted to be Dixon's "woman". Moore replied "No", whereupon Dixon asked Moore if Moore wanted to get hurt, and Moore again responded in the negative. Dixon informed Moore that if Moore became Dixon's "woman", none of the other inmates would molest Moore. The matter was apparently concluded by Moore telling Dixon that Moore would not become Dixon's woman, but that Moore would not complain to the guards. It is conceded no other incident occurred that night.
The following morning, August 11, 1973, at approximately 8:30 A.M., Moore reported the incident to Captain Joe G. Pittman in the presence of Captain Roland Dupree, a prison guard. Pittman had 15 years employment with the penitentiary, Dupree 14 years. From information furnished Moore, Dupree investigated and determined that it was Carney who threatened Moore. Shortly thereafter, Pittman and Dupree noticed a gathering of about six inmates in the yard and felt that some sort of trouble was brewing. Pittman and Dupree went up to the group, searched all present, but found no weapons on any of the prisoners. They did, however, find a "homemade penitentiary knife" on the ground about twenty feet away from the group. Pittman then decided to move Moore from Walnut I to Oak 4 dormitory which was in the same compound as Walnut I. Decedent Breaux was housed in Oak 4.
Breaux, a long term inmate, had formed an intra-prison organization known as the "Brotherhood", whose aim was to protect youthful convicts from sexual exploitation by older and hardened prisoners. Part of the indoctrination of incoming young prisoners consisted of a talk by Breaux who acted with the full knowledge and consent of Warden Henderson. Breaux assured all young admittees that the Brotherhood stood ready at all times to protect them from molestation. Breaux had visited Moore while Moore was confined in solitary.
Neither Pittman nor Dupree made any effort to search for the weapon with which Moore had been threatened. Instead Pittman elected to move Moore from Walnut I to Oak 4, so that Breaux and the Brotherhood would be able to protect Moore. In a a routine change of a prisoner from one dormitory to another, the inmate is simply told to move his belongings and a guard is sent along to see that the move is made to the new location and assign the man a bed in the new dormitory. Pittman and Dupree felt there was no need to transfer Moore out of the compound, and deemed it safe that he be merely transferred to another dormitory away from Carney and Dixon.
At about 9:30 A.M. on the day in question, Breaux and Moore were proceeding toward Walnut I to effect Moore's transfer to his newly assigned lodging. At this same time, Guard Michael Guillot received a report from Tower 5 concerning a "gathering" near Walnut I. Guillot dispatched Guards Davis Benoit and Jason Lamartinere to investigate. Lamartinere had six months experience at the penitentiary. Benoit, who had been employed at the institution for several years, had been assigned to yard duty three months earlier. As Lamartinere approached the group, Breaux requested Lamartinere's assistance in moving Moore to Moore's new lodging. Benoit volunteered to accompany Breaux and Moore into the dormitory to get Moore's belongings. After entering and passing *453 through the lounge, the three entered the sleeping area. Benoit proceeded down the aisle between the two rows of cots on the right; Breaux and Moore proceeded down the aisle between the cots on the left. Benoit saw Carney at or near the third cot from the end of the aisle. He also observed Carney "come around" with a knife and proceed in the direction of Breaux and Moore. Without making any utterance or taking any other action whatsoever, Benoit immediately turned, ran to the door and yelled for help. Carney and Dixon, both armed with knives, then attacked Breaux and Moore. Breaux, unarmed, attempted to defend both himself and Moore. To protect himself, Moore obtained a pillow which he used to absorb several knife thrusts and thus avoid injury. In the meantime, Guillot had noticed the gathering near Walnut I and proceeded to investigate. As he approached, he saw Benoit run out of the dormitory and call for help. Benoit then returned inside the dormitory with Guillot immediately behind. Guillot then noticed Carney and Dixon, both of whom he knew and recognized. He also observed that Carney and Dixon had knives and were engaged in fighting with other inmates. Guillot call to Carney and Dixon by names and demanded they stop. Carney ceased immediately. Another inmate took hold of Dixon and pulled him away. Guillot then proceeded forward toward an inmate lying on the floor. The person proved to be Breaux. Guillot leaned over to examine Breaux and found that Breaux had been stabbed several times. While Guillot was thus examining Breaux, Dixon broke away from the prisoner who was restraining him and stabbed Breaux once in the chest as Breaux was lying on the floor. Guillot then forcibly pulled Dixon away. Despite Guillot's orders, neither Carney nor Dixon would surrender their weapons at that time. Notwithstanding retention of their knives, both Carney and Dixon peaceably accompanied Guillot from the dormitory. Ultimately, after they had left the compound and were in another area, Carney and Dixon voluntarily surrendered their weapons to Guillot. In accordance with strict prison policy, neither Guillot nor Benoit bore any arms whatsoever.
The record discloses the ease with which prison made knives, known as "shanks" in prison parlance, may be fashioned or obtained. In essence a "shank" is any piece of metal or other substance which will hold a sharp edge or cutting surface. Such weapons are made from any piece of metal found loose or which may be removed or pried from any object, appliance or apparatus whatsoever. Cutting edges are produced by the painstaking rubbing of the metal against a brick, rock, or any other abrasive surface until the desired degree of keenness is obtained. Such weapons are readily obtainable on short notice for the price of a few packs of cigarettes.
The testimony of prison officials discloses that daily shakedowns are conducted of dormitories while the prisoners are out on work assignments. It is conceded that despite these precautions, conducted with the aid of electrical metal detection devices, shanks are readily obtainable. As one prisoner witness explained it, his bed and locker could be searched and a knife found and removed, yet he could have another in five minutes if he so desired.
Between January 1, 1969, and November 27, 1973, a total of 348 stabbings have occurred at Angola. Of this number, 44 occurred during the calendar year 1969; 34 during the calendar year 1970; 82 in the calendar year 1971, 51 in the calendar year 1972, and 137 during the period January 1, to November 27, 1973. This averaged 69 stabbings per year for the period noted. During this same period, 34 inmates died of stab wounds. Of this number, 3 died in 1969; 11 in 1970; 3 in 1971; 8 in 1972, and 9 in the period January 1 to November 27, 1973. Deaths from stabbing average 6.8 annually for the period noted.
The testimony of Mrs. Hunt, Warden Henderson and other prison officials show that present inmates are inclined to be more violent than in former years. This *454 phenomenon is attributed to the fact that fewer first offenders are being sentenced to the penitentiary. As a result, most inmates are repeaters serving longer terms. These officials further show that present facilities are woefully inadequate to cope with the present prison population of approximately 3,700 inmates. It was testified that there is a shortage of at least 300 cells for individual incarceration of hardened criminals. It was also testified that at least double the number of presently employed guards are required to maintain order and provide proper supervision of dormitories. Such additional guards are unavailable simply because the legislature has declined to appropriate additional funds to operate the penitentiary, despite the repeated annual requests of the Director and Warden. The record establishes conclusively that living conditions in the penitentiary, including greater personal security and the protection of inmates from attacks of fellow inmates, could be vastly improved if the institution's operating budget were increased.

APPELLANT'S CONTENTIONS OF LIABILITY
The State's liability is urged on the ground that imprisonment of decedent, under conditions which failed to protect him from bodily harm, violated decedent's rights under the Eighth and Fourteenth Amendments to the United States Constitution which, respectively, proscribe cruel and unusual punishment, prohibit abridgment of privileges and immunities, guarantee that one may not be deprived of life, liberty or property without due process of law, and insure equal protection of the laws to all. It is also contended the State violated certain state statutes (hereinafter discussed) governing the conduct and operation of prisons by failing to provide adequate facilities and personnel to insure the safety of inmates. It is urged that the state's liability in this area is absolute and unconditional.
As regards the Warden and other defendant prison personnel, it is contended that they too are absolutely and unconditionally liable for the welfare, safety and protection of inmates. It is also charged that the named officials failed to provide adequate facilities; failed to take adequate measures to stop the practices of homosexuality and the custom of "prison wives", which conditions are conducive to contentions among inmates; failed to properly train and instruct prison guards; failed to take measures to detect and segregate deranged prisoners, which Carney and Dixon are alleged to be; failed to take effective measures to stop the manufacture of "shanks", and failed to adopt adequate "shakedown" measures to detect and remove "shanks" from the possession of prisoners.
In addition, Guillot, Dupree and Benoit are accused of negligence in failing to take adequate measures to protect Moore and Breaux after learning that Carney and Dixon had threatened Moore with weapons. These officials are further charged with negligence in failing to isolate Carney and Dixon from Moore and Breaux, and failure to shakedown Carney and Dixon and remove their weapons. Guillot and Benoit are also charged with failure to stop the assault upon Moore and Breaux which incident occurred in their presence.

LIABILITY
In rejecting Appellants' demands, the trial court relied upon the law as enunciated in St. Julian v. State, La.App., 98 So.2d 284, and more recently reiterated and reapplied by the Supreme Court in Parker v. State, La., 282 So.2d 483. The rule thus established is that a penal institution is not the insurer of the safety of an inmate against attack by another inmate. The test in such cases is that of ordinary and reasonable care. Penal authorities are not liable for injuries inflicted upon an inmate by a fellow inmate unless the authorities know or have reason to anticipate that harm will ensue and fail to take reasonable care to prevent the harm from occurring.
*455 In Parker, plaintiff-inmate, a homosexual, was stabbed by another inmate-homosexual, Edmonson, with whom Parker had had a relationship. Both prisoners resided in the same Camp. When the relationship was disrupted by a third prisoner, Edmonson threatened Parker who repeatedly complained to officials. Parker and Edmonson were summoned before Captain Couvillon who, after interrogation and counseling the prisoners, concluded they left his office as friends. Weapons searches of prisoners' barracks were conducted regularly. Despite a check conducted on the night of September 15, 1969, the following morning, Edmonson stabbed Parker with a 16 inch "shank" while Parker slept in his bunk. Edmonson occupied the second floor of the two story dormitory in which both he and Parker were housed; Parker's bunk was on the first floor. Edmonson gained entry to the first floor sleeping area when a guard opened the door to the second floor dormitory to allow kitchen personnel to come downstairs to bathe before reporting to work.
Parker charged the guard with negligence in failing to keep the door locked. This contention was rejected on the finding that circumstances required the door be opened.
In Parker, the prison officials were charged with negligence in failing to prevent the acquisition or making of "shanks", the hiding of the weapon by Edmonson and the attack on plaintiff. The court dismissed this charge predicated upon evidence virtually identical to that introduced in this instance. We refer to the testimony, quoted in Parker, showing that "shanks" can be made from any piece of metal, and that periodic searches for weapons were practiced at the institution. In addition, Parker noted that a search of Edmonson's dormitory had been made the night before the assault. On this basis, the court concluded there was no negligence either with respect to the search procedure in general or the particular actions taken with respect to Edmonson, and that to require more would impose absolute liability.
The final charge of negligence in Parker was that the prison officials failed to isolate Parker from Edmonson or at least remove Parker to separate facilities. The court concluded there was no negligence in this respect considering that a search of Edmonson's effects was made the previous night; that the men had left Couvillon's office the day before, ostensibly as friends, and that to require isolation in each such similar incident would create chaos in prison administration, especially since daily reports of threats of harm seldom result in actual injury or death.
LSA-R.S. 15:829 charges the Director of the Department with the following duties and obligations:
"The director of corrections shall prescribe rules and regulations for the maintenance of good order and discipline in the facilities and institutions under the jurisdiction of the department, which rules and regulations shall include procedures for dealing with violations thereof. A copy of such rules and regulations shall be furnished each inmate. Corporal punishment is prohibited.
The director shall maintain a record of charges or infractions of the rules and regulations by inmates, any punishments imposed therefor, and of any medical examinations of inmates."
The Superintendent (Warden) of the State Penitentiary is charged with the following duties pursuant to LSA-R.S. 15:853, which pertinently provides:
"A. The superintendent shall exercise the following powers:
(1) Subject to the provisions of Subsection B of this Section, he shall have general management and control over the convicts committed to the penitentiary, their custody, discipline, welfare, and safety. He shall make adequate provision *456 for the segregation of young shortterm first offenders as provided by law."
Webster's Third New International Dictionary, 1963, defines "guard" as follows:
"1: one that defends against injury, danger or attack; 2: a man or body of men stationed to protect or control a person or position; (e) one who is responsible for the safety and discipline of inmates of a prison, reformatory, or other place of detention while they are within the institution, in transit to or from the institution or on work detail; 4: (a) a state of watchfulness and readiness against danger; state of standing in defense of a person or thing against possible injury, attack, or theft."
The general rule governing a state's liability for the malfeasance or negligence of prison officials is stated in Vol. 60 Am. Jur.2d, Verbo Penal and Correctional Institutions, Section 19, Page 824, as follows:
"The doctrine of respondeat superior is not applicable to a state, and the latter is not liable to individuals for the misfeasance, laches, or unauthorized exercise of power by its officers or agents, unless it voluntarily assumes liability in such a case. Accordingly, in the absence of statute, the state is not liable to a convict for injuries sustained by him as a result of the negligence of a prison employee, whether the convict is working outside or inside the place of imprisonment. However, where the state has waived its immunity from liability by general statute and has consented to have the question of its liability determined in accordance with the same rules of law as are applied in actions against individuals and corporations, the state may be held liable for injuries sustained by a prisoner as a proximate result of the negligence of prison employees, and the state also has the duty to apprise inmates of any dangers known to it, to the extent that the prisoners may not reasonably be expected to discover such dangers themselves. Also, in case of such waiver of immunity the state may be chargeable with the negligence of another inmate, as where the negligence of a teamster, driving a haywagon, caused injury to a fellow inmate."
In this instance, no issue of governmental immunity is presented considering the following procedural posture of this case. In the trial court, the State filed a motion to dismiss based on the allegation that plaintiffs failed to plead legislative authorization to institute the suit and hold the state liable in damages. The issue of governmental immunity from liability and suit was presented to the trial court both in brief and oral argument. The trial court, considering the motion to dismiss to be an exception of no cause of action, overruled the State's motion. Said decree is an interlocutory judgment which does not cause irreparable injury, and therefore was unappealable by the State. LSA-C.C. P. art. 2083.
The State has not answered Appellant's appeal in this instance. LSA-C.C.P. art. 2133 provides that an Appellee who wishes a judgment modified, revised, or reversed in part, must answer Appellant's appeal. In this case, the State not only failed to answer the appeal herein, but has also failed to reurge the issue of governmental immunity either in brief or oral argument before this court. The entire thrust of the State's position on appeal has been devoted to a showing that under the rule of Parker, above, neither the State nor any of the other defendants herein are liable on the merits. The judgment of the trial court rejecting the State's plea of governmental immunity has become the law of this case and is binding upon the parties herein.
Inasmuch as the issue of governmental immunity is absent herein, the doctrine of respondeat superior is applicable. It follows that the State and the Department are liable for the negligence of their employees, if any be found negligent herein.
*457 Webb v. State of Louisiana, Through Department of Institutions, La.App., 91 So.2d 156.
A majority of three members of the court have concluded there is no basis for holding the guards Pittman, Dupree and Benoit personally liable under the facts of this case. The majority finds these employees had no reason to expect that Breaux was in danger of harm because it was Moore, not Breaux, who had been threatened by Carney and Dixon. The majority are of the further view that Benoit was not negligent in failing to take any action to stop the armed attack upon Moore and Breaux before the assault began. Two members of the court, including the author of this opinion, dissent from these majority findings.
We find no basis for liability on the part of Director Elayn Hunt, Warden C. Murray Henderson, Assistant Warden Hayden J. Dees, Assistant Warden Lloyd W. Hall, or Chief Security Officer Robert Bryan. These officials were in no way connected with or had any knowledge of the circumstances leading to Breaux's death. The record also shows that the security measures and shakedown procedures in effect on the date of Breaux's death were substantially the same as were approved by the Supreme Court in Parker, above.
Parker, above, did not consider the issue of the State's alleged liability for failure to provide adequate facilities and personnel to afford reasonable protection to prison inmates. We have been cited no authority treating his particular point. Nevertheless, we are of the view that the State does have a duty in this regard.
We believe that, consistently with the views expressed in Parker, above, it may be logically argued that while the State is not the absolute insurer of the safety and welfare of persons committed to penal or corrective institutions, nevertheless, the State is obligated to provide facilities and environments reasonably calculated to protect such persons from the danger of armed attack by fellow inmates. Individuals so confined are deprived of the normal power and opportunity for self defense. They must, of necessity, rely primarily upon the protective facilities afforded by the institution in which they are immured.
The executive defendants herein concede the seriousness of the problem of securing prisoners from attack by fellow convicts armed with prison made knives. They also acknowledge that the number of stabbings and deaths due to such incidents has drastically increased since the Parker incident occurred on September 16, 1969. They attribute this deplorable fact solely to the insufficiency of facilities and personnel, which condition can be relieved only by increased legislative appropriation of funds for operation of the penitentiary. Such additional funds have not been forthcoming despite repeated appeals to and appearances before appropriate legislative committees.
From the record, we are convinced that the fault in this instance is not that of prison executives. Their inability to properly perform the functions imposed upon them by law is due to circumstances beyond their control. In this respect, the fault is that of the State in having failed its obligation to provide the means for adequate facilities and supervisory personnel. For the consequences of such remission, the State is liable.

DAMAGES
Decedent was serving a life term plus ten years for murder, manslaughter and aggravated battery. Decedent would not have been eligible to apply for pardon until January 1, 1977. At the time of his death, decedent was 27 years of age. The record discloses that Appellants visited decedent regularly and kept in constant touch with their son. To paraphrase language in *458 St. Julian, above, the life of an imprisoned felon may be as dear to his parents as that of a most dutiful and law abiding off-spring. Under the circumstances, however, we feel that the awards in this instance should be somewhat less than those normally allowed parents for the loss of an adult son. We conclude that, in this case, an award of $10,000.00 to each parent is indicated.
Appellant Irvin Breaux, Sr. proved special damages (funeral expenses) in the sum of $1,088.70, which amount he is entitled to recover.

DECREE
It is ordered, adjudged and decreed that the judgment of the trial court rejecting the demands of Appellants, Irvin Breaux, Sr. and Dolores Weathers Breaux, be and the same is hereby reversed, annulled and set aside.
It is further ordered, adjudged and decreed that there be judgment herein in favor of Plaintiff, Irvin Breaux, Sr., against defendant, The State of Louisiana, Through The Louisiana Department of Corrections, in the sum of $11,088.70, and in favor of plaintiff, Dolores Weathers Breaux, against defendant, The State of Louisiana, Through The Louisiana Department of Corrections, in the sum of $10,000.00, together with legal interest thereon from date of judicial demand, until paid; the State of Louisiana, Through The Louisiana Department of Corrections, to pay such costs to which it is subject pursuant to law.
It is further ordered, adjudged and decreed that the judgment of the trial court is affirmed except insofar as it is hereby expressly reversed and amended.
Affirmed in part, reversed in part, and rendered.
LANDRY, Judge (dissenting).
I respectfully dissent from the majority refusal to hold the guards Pittman, Dupree and Benoit personally liable for failure to discharge the duties incumbent upon them, as defined in the majority opinion.
Pittman and Dupree were aware that Carney and Dixon had threatened Moore with bodily harm unless Moore consented to be their "woman", and that both Carney and Dixon possessed weapons with which they could make good their threats. I am of the opinion that experience should have alerted Pittman and Dupree to the likelihood of harm to Moore and any other prisoner who might assist or participate in removing Moore from Carney and Dixon's influence. I find the record supports the conclusion that the movement of Moore was fraught with the possibility of a violent eruption, especially since Carney and Dixon were known to be armed. In my judgment, the circumstances demanded at least a search of Carney and Dixon's effects in an effort to relieve them of their knives. I also believe that, before Moore was moved, Pittman and Dupree should have made certain that both Carney and Dixon were absent from the dormitory so that there would be no possibility of their confronting Moore and Breaux.
I believe that Benoit failed his obligation to protect both Breaux and Moore. The record discloses that when Benoit entered the sleeping area of the dormitory, he was about 15 feet distant when he noticed Carney and Dixon, both armed with knives, proceeding toward Breaux and Moore. It was obvious to Benoit that a knife attack upon two prisoners was about to take place in his presence. At the time, and in the position he occupied, Benoit was in no danger of immediate personal attack. Moreover, the record discloses that inmate attacks upon guards are extremely rare despite prisoner knowledge that guards are unarmed. This finding is supported by the fact that Guillot was unharmed although Dixon stabbed Breaux again as Guillot was preparing to examine Breaux as Breaux lay wounded on the floor.
I concede that the record contains conflicting testimony concerning whether or *459 not Breaux was armed. The trial court resolved this conflict by concluding that Breaux was unarmed. I concur in this determination although I do not believe that finding Breaux unarmed is a prerequisite to liability in this instance. I am of the opinion that even though Benoit was unarmed, it was incumbent upon him to exercise some show of authority in an attempt to prevent an imminent armed attack upon two prisoners in his presence, which prisoners were then in his personal charge. I believe it was Benoit's duty to take some action evidencing his intent to intervene to prevent injury to Moore and Breaux, neither of whom were armed, or at least verbally command Carney and Dixon to desist. Had Benoit exercised even the slightest degree of authority before the fatal encounter commenced, it is highly probable the actual attack may not have occurred. I deem it simple logic that it is far easier to stop an attack before the first blow is struck, than it is to terminate a violent encounter once begun. I believe that Benoit owed Moore and Breaux the duty of taking some action in their behalf, notwithstanding it may have proved futile. Instead, Benoit left the scene without uttering a word, went to the door and summoned aid. During this interval the fatal encounter began. While Benoit's actions may be explained by the fact that he had only four months experience on yard duty, he nevertheless failed his obligation. I do not mean to advocate the rule that a guard must necessarily sacrifice his life for those under his protection. Nevertheless, I feel that Benoit was remiss in utterly failing to exercise even the slightest show of authority under the circumstances.
For these reasons I respectfully dissent from the refusal to hold Dupree, Pittman and Benoit personally liable.
SARTAIN, Judge (dissenting in part).
I must dissent from that portion of the majority opinion which holds the State of Louisiana responsible for the death of Irvin Breaux. It is my considered opinion that such a holding is a conscious departure from or at least an unwarranted extension of the rule recently announced in Parker v. State, 282 So.2d 483 (La.1973), and the authorities cited therein.
The rule as stated in Parker, both by Justice Sanders, as author of the original opinion, and by Justice Marcus, on rehearing, is that:
"A penal institution is not the insurer of an inmate against attacks by other inmates. The standard is that of reasonable and ordinary care. The majority rule is that in order to hold penal authorities liable for injury inflicted upon an inmate by another inmate, the authorities must know or have reason to anticipate that harm will ensue and fail to use reasonable care in preventing the harm." 282 So.2d 483, 486.
Applying the above rule to the instant case, the question for resolution is: Did the authorities at Angola have reason to believe that harm would befall inmate Breaux? The trial judge answered the question in the negative. In his oral reasons for judgment he stated:
"In summary, we find that the prison authorities in the instant matter did not know or have reason to anticipate on August 11, 1973, that harm would ensue to Breaux on that date. One must concede that whatever concern that may have existed was directed towards Moore, nor Breaux. It was Moore that was the object of possible homosexual attack and the prison authorities readily agreed to permit his transfer to a more protective environment. One can say that the prison personnel certainly used reasonable care in seeking to prevent any harm to Moore."
* * * * * *
"Again, there was no adequate reason in this case for the prison authorities to anticipate harm to Moore at the time in question, and certainly not any harm to *460 Breaux at that particular time and for whose death this action is brought."
The record is completely supportive of this conclusion. It was Breaux who went to Moore when the latter was confined to a cell block at his own request. It was Breaux who suggested to Moore that the latter leave the cell block and return to the medium security unit. It was Breaux who undertook to assist Moore in his movement from Walnut I, away from Carney and Dixon, to Walnut IV, where Breaux was housed. I find no evidence in the record to support any conclusion that Moore's movement was anything but routine or that the movement itself posed any danger to Moore.
The record also clearly establishes the fact that no one, including Breaux's closest inmate friend, Kenneth Peterson, anticipated any difficulty.
The majority opinion correctly states that Moore was threatened by Carney and Dixon the night before the fatal stabbing of Breaux. However, Moore himself testified that he did not report the incident that night because to have done so would have branded him as an informer in the eyes of his fellow inmates. The following morning when the guards were informed of the incident of the previous night they determined to move Moore under circumstances that would not "point the finger" to Moore for the very same reason. Accordingly, it was determined to move Moore before Carney or Dixon were searched for a knife. It was a judgment decision on their part which I deem to be a prudent one under the circumstances.
I readily concede, however, that if Moore had been the subject of the attack the rule in Parker, above, would have justified the trial judge in holding the State responsible.
I must also disagree with the majority and the statement of the trial judge to the effect that at the time of the incident Breaux was unarmed. The evidence convinces me to the contrary. Inmates Percy Albert Wright, Cyrus Patterson, Raymond Morgan and Irvin G. Hardon testified that Breaux did, in fact, possess a knife. Morgan stated that Breaux was the first of the three (Breaux, Carney and Dixon) to draw a knife. The trial judge frankly stated that he doubted the veracity of these inmates' testimony. However, their testimony is corroborated by prison guard, Jason Joseph Lamartinere, who testified that when the fracas was finally broken up he observed a third knife on the bed next to where Breaux was killed. Guard Davis Benoit, who followed Breaux and Moore into the dormitory to remove Moore's belongings, stated that he was not in a position to say who precipitated the dispute, but that when Carney approached Breaux, Carney had a knife in his right arm and a towel wrapped around his left arm. When asked what significance he placed on the presence of the towel, he explained that it was for protection in case Breaux had a knife. These witnesses were all called by the plaintiffs and for whom plaintiffs must vouch.
For these reasons I respectfully dissent.