308 So.2d 290 (1975)
Marion Paul Craft, widow of Elluis CRAFT, Plaintiff-Appellant,
v.
STATE of Louisiana et al., Defendants-Appellees.
No. 10081.
Court of Appeal of Louisiana, First Circuit.
February 10, 1975.
Rehearing Denied June 30, 1975.
*291 David L. Morgan, Jr., New Orleans, for plaintiff-appellant.
Stanford O. Bardwell, Jr., Baton Rouge, for defendants-appellees.
Before SARTAIN, ELLIS and de la HOUSSAYE, JJ.
SARTAIN, Judge.
This suit for wrongful death was instituted by the widowed mother of Louis Craft, who died by violent means on April 2, 1973, while an inmate at Louisiana State Penitentiary at Angola. The defendants are the State of Louisiana, the Director of the Louisiana Department of Corrections, the Warden, Assistant Warden, and the Chief Security Officer at the penitentiary. From the judgment dismissing her suit, Mrs. Craft has appealed. We affirm.
Plaintiff seeks to invoke the doctrine of res ipsa loquitur which she claims is applicable to the instant facts and circumstances. Further, she contends that the defendants are unconditionally liable for the death of her son for two reasons: (1) because R.S. 15:821 et seq. and 15:851 et seq., impose absolute liability upon both the penitentiary and department personnel for the welfare and safety of inmates; and, (2) because bailment principles are applicable to the instant situation to render defendants, *292 as bailees, absolutely liable for the safety of her son. Finally, she urges that we declare the rule announced in Parker v. State, 282 So.2d 483 (La.Sup.Ct., 1973) unconstitutional as violative of her son's rights under the 8th and 14th amendments to the Federal Constitution.
In his extensive written reasons for judgment the trial judge found the following facts, which we find to be an accurate statement thereof:
"Certain undisputed facts were established at trial. On April 2, 1973, all four of the Hickory units were unoccupied by inmates and were therefore closed. Mr. Ernest Bordelon, who was assigned to Pine unit as a security officer, testified that he talked to Louis Craft at approximately 9:00 A.M. when he let him out of his dormitory into the yard surrounding the complex. The compound was enclosed by a fence and the open area was used for recreational and exercise purposes.
In the morning hours of April 2, 1973, a `shakedown' of the medium security compound was being carried out by the security personnel assigned to said area along with additional individuals `pulled in' from other parts of the prison. A `shakedown' is a preventive correctional measure employed to search out and remove `contraband' in the hands of inmates, said contraband including among other items, weapons, alcoholic beverages and drugs.
During the operation, a piece of concrete and a piece of plywood with blood on them were found in the area between Hickory 3 and 4. Inquiry was made of the prison infirmary to determine whether any inmates had presented themselves for treatment of cuts of any kind. Further, the dormitories were checked to see if any of the inmates had been cut or if they had any blood on them. Johnny Butler, one of the security officers taking part in the shakedown, testified that around 10:00 A.M., he crawled through a hole in the foundation of Hickory 4 where the blood was found. Craft's body was not discovered at that time. All of the dormitories in the medium security compound are built approximately three feet above the ground with the space between the dormitory flooring and the ground being encircled by a concerete wall along the perimeter of each dormitory. The particular hole found in the wall of Hickory 4 had been previously repaired and prison officials testified that said hole's reappearance was first noticed and discovered during the shakedown on April 2, 1973.
On said date, the noon head count revealed that one man was missing. After a second count, a roll call was taken and it was determined that Louis Craft was absent. Immediately, an extensive search by prison security personnel began. Due to the prior findings of bloody concrete and plywood between Hickory 3 and 4 where the hole in the wall had been knocked out, the area beneath Hickory 4 was reentered for a comprehensive probing. At approximately 4:50 P.M., in a shallow sandy grave, the body of a black male was discovered under Hickory 4 dormitory, said body later identified to be that of Louis Craft.
W. M. Daniel, Deputy Sheriff of West Feliciana Parish, testified that the Sheriff's office had been informed around noon on April 2, 1973, that an Angola prisoner had possibly escaped, and that subsequently his office was informed that the body of a man had been found buried under one of the dormitories. He went to Angola with Deputy Thomas Guerin and Dr. A. R. Gould, West Feliciana Parish Coroner, arriving there at about 6:30 P.M. It was at this time that the body was removed from its grave and officially identified.
Dr. Gould testified that Louis Craft died by violent means as a result of blunt blows to the head and thirteen stab wounds in the chest.

*293 Two inmates, Willie Edmonson and Henry Bradford, were questioned by prison and West Feliciana Parish officials as possible suspects with regard to the murder of Louis Craft. They were initially interrogated upon the basis of the prison `grapevine' which linked them to Craft's death. Additionally, Clyde Charles, another Angola inmate at that time, in a deposition entered into evidence as Plaintiff's Exhibit P-9, claimed that Edmonson, Bradford and Craft were in the area between Hickory 3 and 4 between 8:30 and 9:00 A.M. on the morning of Craft's murder. He also alleged that a day or two prior thereto he had seen Edmonson and Bradford in the same location with a shovel.
Inmate Charles, however, did not see the actual murder of Louis Craft and, in fact, no eyewitnesses to the crime were ever discovered. Although murder charges were brought against Edmonson and Bradford in West Feliciana Parish, said charges were `pretermitted.' To date, no other criminal action has been forthcoming from the West Feliciana Parish authorities and the murder of Louis Craft is officially unsolved."
The principal thrust of plaintiff's argument, both here and in the district court, is that the State is at fault in not providing sufficient security personnel for the penitentiary. Supportive of this argument is the admissions on the part of the defendants that additional personnel is not possible under the budget authorized by the Legislature.
It is further conceded by defendants that weapons, knives and other forms of contraband are constantly found in the possession of inmates. While this is true, the record amply reflects that it is a daily practice to search for these items. Reasons given for their existence were many. Primarily, inmates in pursuit of their industrial training have access to metal and devise every conceivable means to fashion an instrument capable of harm.
Plaintiff further argues that the steady increase in the number of stabbings at the penitentiary over the past several years is proof of the inadequacy of security measures at that institution. While defendants admit to the increase in stabbings, they give as one of the reasons therefor their observation that the prisoner of today is more hardened and violence prone than was the prisoner of several years ago, and that it is virtually impossible to prevent an inmate determined to harm another from doing so unless they have some prior knowledge of such intention and can separate the parties before the incident occurs.
Our reading of the record convinces us of the sincerity on the part of the individual defendants in this cause in their efforts to discharge the responsibilities imposed upon them by law in connection with the care, control and safety of the prisoners.
We now turn to the arguments advanced by plaintiff who seeks to overturn the ruling of the trial judge against her.
We concur with the trial judge in his rejection of the applicability of res ipsa loquitur. We do so under the particular facts of this case. Many possibilities were presented, each as believable as the other. While plaintiff strenuously urges that the death of her son was occasioned by inmates Bradford and Edmonson, this assertion is based on opinion evidence of several of the individual defendants based on rumors permeating the penitentiary following the homicide. The proof necessary here is certainly not that required in a criminal trial (beyond a reasonable doubt) as this is a civil matter and therefore only a preponderance of evidence is sufficient. But the evidence here is pure speculation on the part of those who were permitted to venture an opinion. During the morning of the murder of Louis Craft, the quarters in which he and his alleged assailant were quartered was being subjected to an extensive "shakedown" for contraband. Based on the evidence in the record it is just as plausible that Craft voluntarily went to the *294 spot of his demise as that he was forcibly taken there. The record clearly preponderates to the effect that decedent was fatally struck just outside Hickory 4, a few yards from where he was buried beneath the building. The number of guards in the general area negate the argument that there was any altercation prior to his being struck. Common sense dicates that he did not knowingly walk to the spot of his demise, but he had been seen in that particular area shortly before, having gone there voluntarily for reasons known only to himself and without any display of struggle. The Hickory unit was unoccupied at the time and it was off limits to inmates. The murder of Craft obviously occurred during the distraction created by the shakedown in the Pine unit.
Assuming, arguendo, that there was a shortage of guards for security purposes as plaintiff asserts here, the unalterable fact remains that at the moment of Craft's death the Pine unit from which he departed was virtually covered with security personnel. We are satisfied that it is for these reasons, among others, that the trial judge rejected the application of the doctrine of res ipsa loquitur. See Boudreaux v. American Insurance Co., 262 La. 721, 264 So.2d 621 (1972).
With respect to the unconditional liability on the part of the defendants allegedly imposed by R.S. 15:821 et seq. and 15:851 et seq., we think the Supreme Court in Parker v. State, 282 So.2d 483, clearly disposed of the issue contrary to plaintiff's contention. Under the facts in Parker, the Supreme Court held that the issue was not one of absolute liability under the statutes but was whether or not the prison officials had adhered to a standard of care that is reasonable. In the absence of absolute liability, plaintiff contends that Parker v. State, supra, put the prison officials on notice that Edmonson, who was also the assailant in Parker, was possessed of such dangerous propensities that he should not have been permitted to return to the open dormitory. The record before us reveals that Edmonson remained confined until January of 1971, when he was released and permitted to return to the open unit. His release was the result of a Board inquiry into his past conduct and it was determined that he should be released from maximum security. From January of 1971 until February 2, 1973, for a period of twenty-eight months, Edmonson did not give the officials any cause to suspect that he would again be engaged in acts harmful to other inmates. This, of course, assumes that Edmonson was one of decedent's assailants, which, based on the record before us, is in itself inconclusive. Thus, under these circumstances, we can not find that the release of Edmonson from maximum security was an act of negligence on the part of the individual defendants.
We must also concur with the finding of the trial judge in that there existed no bailor-bailee relationship between the State and the decedent. The circumstances of this case are not susceptible to applicability of the bailment provisions of our Civil Code.
Plaintiff's next contention is that the Parker precedent should be declared unconstitutional by us as violative of her son's rights under the 8th (prohibition against cruel and unusual punishment) and 14th (due process clause) amendments to our Federal Constitution. Gates v. Collier, 489 F.2d 298, 501 F.2d 1291 (5th Cir., 1974). On this point we quote with approval the trial judge's decision on this issue:
"Specifically, plaintiff claims that the precedents set by St. Julian [St. Julian v. State, La.App., 98 So.2d 284] and Parker are unconstitutional in that they impose an `insurmountable burden of proof upon inmate litigants,' and deny inmates equal protection of the laws guaranteed by the Fourteenth Amendment of the U. S. Constitution. Secondly, plaintiff avers that incarceration in Angola, under the conditions there prevailing, constitutes *295 `cruel and unusual punishment' in violation of the Eighth Amendment to the U. S. Constitution.
The Court considers these constitutional invocations to be without merit. Equal protection of the laws is guaranteed to all under like circumstances. In this case, the question is one of equal protection for individuals who have committed a crime and have been placed in confinement for a period of time as inmates subject to the restrictive custody of the State. The Court does not feel that the principles of St. Julian and Parker deny equal protection to the class of individuals designated as `inmates' of which Louis Craft was a member.
A doctrinal formula imposing liability upon the State and/or its employees for negligence when a showing of failure to exercise reasonable care is forthcoming does not deny equal protection of the laws to those inmates seeking to establish said liability. Plaintiff contends that the `insurmountable burden' arises when an inmate is unaware that he is in danger and the injury producing attack occurs without forewarning. The Court fails to discern any denial of equal protection in said situation when it is remembered that each inmate in `like circumstances' must prove the absence of reasonable or ordinary care on the part of the State and/or its employees.
Assertions of `cruel and unusual punishment' by plaintiff in violation of the Eighth Amendment to the U. S. Constitution were weighed by the Court and such argument was found to be wanting and unsound. Imprisonment itself is not `cruel and unusual punishment' reprobated by constitutional provision. State v. Howard, 262 La. 270, 263 So.2d 32 (1972). Cruel and unusual punishments are those that are barbarous, extraordinary or grossly disproportionate to the offense, those that shock the conscience of civilized men. State v. Miller, 263 La. 960, 269 So.2d 829 (1972). At the time of his death Louis Craft was serving natural life for murder. Without proof of chronic failure to exercise reasonable care which would subject inmates to unreasonable risks and hazards, plaintiff's claim of cruel and unusual punishment must fail."
We find no authority for awarding Mrs. Craft expenses incurred in connection with the transportation of her son's body from Angola to New Orleans for burial and for actual burial costs. Having found that there is no liability on the part of any of the defendants in this cause, plaintiff's claim for such expenses must be rejected.
Accordingly, for the above reasons, the judgment of the District Court is affirmed at plaintiff's costs.
Affirmed.