377 So.2d 1317 (1979)
Charles Arnold WATTS
v.
C. Paul PHELPS et al.
No. 12854.
Court of Appeal of Louisiana, First Circuit.
November 12, 1979.
Rehearing Denied December 27, 1979.
*1318 Charles Arnold Watts, in pro. per.
William J. Guste, Jr., Atty. Gen., Judy F. Pierce, Staff Atty., Baton Rouge, for defendants-appellants C. Paul Phelps, et al.
Before COVINGTON, LOTTINGER and COLE, JJ.
LOTTINGER, Judge.
This is a suit by the plaintiff, an inmate at Angola State Penitentiary, who seeks to have certain prison regulations declared unconstitutional and who questions the propriety of his transfer from one prison unit to another without a hearing.
The defendants have appealed from the trial court judgment declaring one of the prison rules unconstitutional on the grounds of cruel and unusual punishment. The plaintiff has appealed the trial court judgment insofar as it held that he was not entitled to a due process hearing upon his transfer from one maximum security unit to another.
THE FACTS
The plaintiff Watts has been in and out of prison over the past 17 years for various offenses. While serving his present sentence for simple burglary he has attempted to escape at least five times and has been cited for a number of disciplinary infractions. On October 28, 1977, Watts was transferred to the administrative lockdown section of Camp J, a maximum security section of the prison, because of his refusal to work, a disciplinary infraction. He had previously been housed at CCR (Close Cell Restriction), another maximum security unit but one with perhaps a few additional privileges for the prisoners housed there. *1319 Administrative lockdown at Camp J is a temporary holding facility, used in this case to hold the prisoner pending outcome of his disciplinary hearing.
On October 31, 1977, the prison disciplinary board met, found Watts guilty of the infraction and sentenced him to 25 days loss of good time and to extended lockdown at Camp J. However, the Camp J sentence was suspended for 90 days, i. e., if Watts received no further disciplinary citation for a 90-day period, he would not have to serve the Camp J sentence.
Some three days later, on November 3, 1977, an "emergency" administrative order from a deputy warden ordered that Watts be moved to the extended lockdown section of Camp J. No reason was given for the order but the deputy warden noted that the move from CCR to Camp J was a "lateral" move.
Camp J, as described by the major who runs it, is a "segregation unit" at Angola where inmates who are antisocial or who cannot live with the general prison population are sent. The "scum" of the prison population is housed at Camp J, according to the major's testimony. Every 90 days, each Camp J inmate is entitled to a review board hearing to determine if his record and attitude merit his transfer back to the general prison population.
Because they are housed in a maximum security section, Camp J inmates are subject to a number of rules not applicable to other prison areas. The inmates stay in their cells 23 hours a day and are given one hour to exercise and shower outside the cell. They do not work, either because of their security risks or because they refuse to. They have limited commissary privileges, and most other privileges enjoyed by the general population are curtailed.
CRUEL AND UNUSUAL PUNISHMENT
One of the rules peculiar to Camp J inmates prohibits maximum security prisoners from lying in their bunks between the hours of 4:00 a. m. and 5:00 p. m. on weekdays.
These are the hours other inmates work, and prison authorities felt that it would be unjust to allow maximum security inmates to lie in their bunks while other prisoners worked in the fields. In written reasons for judgment, the trial judge held the rule constituted cruel and unusual punishment and was therefore unconstitutional. He narrowed his ruling to apply only to those maximum security inmates who were prohibited from working by the prison administrators. The ruling "does not apply to inmates who are subject to work classification and refuse to work," the trial judge said. "The unreasonable nature of the rule stems from the fact that a maximum security inmate may not work. If he is not permitted to work, there is no reason for imposition of any limitations on the use of his bed."
We must decide whether the rule in question violates the state and/or federal constitutional prohibitions against cruel and unusual punishment.
The United States Constitution and the Louisiana Constitution of 1974 both prohibit the imposition of cruel and unusual punishment, but they use different language. The Eighth Amendment to the U. S. Constitution prohibits the infliction of "cruel and unusual punishments." The Louisiana Constitution of 1974, Article I, Section 20, prohibits the imposition of any "cruel, excessive or unusual punishment."
Whether the use of the conjunctive "and" or the disjunctive "or" has any bearing on the interpretation of these two provisions is an interesting question fraught with many complexities. Louisiana cases considering the state's constitutional provision place more emphasis on the addition of the word "excessive" in the state constitution than they do on the use of the disjunctive "or." State v. McClinton, 329 So.2d 676, 677 (La. 1976); State v. Whitehurst, 319 So.2d 907, 909 (La.1975); State v. Bryant, 325 So.2d 255 (La.1976), on rehearing, Tate concurring at 265; see also Hargrave, "The Declaration of Rights of the Louisiana Constitution of 1974," 35 La.L.Rev. 1, 63 (1974); and Jenkins, "The Declaration of Rights," 21 Loy.L. Rev. 9, 38 (1975). The courts seem to read Article 1, Section 20 as prohibiting both cruel and unusual punishment and excessive punishment.
*1320 Under the facts of this case we do not have to decide whether use of the disjunctive in the state constitution could ever change the results of a case interpreted under the language of the U. S. Constitution. For it is clear that the rule in question is neither cruel, excessive nor unusual.
To be cruel and unusual, a punishment must be "barbarous [,] extraordinary, or grossly disproportionate to the offense. In short, the constitutional prohibition is directed to punishments that shock the conscience of civilized men." State v. Crook, 253 La. 961, 221 So.2d 473, 476 (1969); State v. Miller, 263 La. 960, 269 So.2d 829 (1972); Craft v. State of Louisiana, 308 So.2d 290, 295 (La.App.1st Cir. 1975), writ den., 319 So.2d 441, cert. den. 423 U.S. 1075, 96 S.Ct. 859, 47 L.Ed.2d 84.
The trial judge made a distinction in his decision between prisoners who refuse to work and prisoners who are not allowed to work because of the security risks they impose. We think the distinction should make no difference in the outcome of this case. The prisoner here was confined to Camp J because of his propensity to escape. Before his confinement he attempted to escape 5 or more times and he has been cited for a number of disciplinary infractions. His confinement to Camp J is the direct result of these disciplinary problems. Prisoners in Camp J do not work because they refuse to or because security measures that must be taken while they are in the fields would be prohibitively expensive. Therefore these prisoners are confined in their cells while other prisoners are serving their terms in the fields. Prison officials apparently felt that allowing maximum security inmates like the plaintiff in this case to lie in their beds during the daylight hours while other prisoners were sweating in the fields would be an injustice to those prisoners who have to work out their terms. This injustice, prison officials apparently felt, could lead to insurrection among the working prison population.
This bed rule certainly is not cruel. It is not a punishment that is barbarous, extraordinary, or grossly disproportionate to the offense. It does not shock the conscience of civilized men.
The rule is not excessive because it is tailored to a situation which prison officials reasonably deemed needed correcting. In fact, the rulerather than being a form of additional punishmentactually results in parity throughout the prison population.
Some persons might argue that the rule is unusual in that a reasonable prison official would welcome an inmate who wishes to lie in his bunk all day. An inmate who is lying down all day is unlikely to cause trouble to the guards during that time. On the other hand, it could also be argued that a prisoner who lies down during the day and gets his rest then would be more likely to cause trouble at night when other inmates are trying to sleep.
It is this latter fact, plus the fact that Louisiana courts give great deference to prison administrators in the promulgation and enforcement of disciplinary measures, that remove any question as to the constitutionality of the regulation. In Louisiana, prison officials are accorded wide latitude in the administration of prison affairs. Only in extreme cases will courts interfere with the administration of prison regulations or disciplinary procedures. See La.R.S. 15:828, 15:829. See also Sanchez v. Hunt, 329 So.2d 691 (La.1976). And only if a prison rule or regulation is clearly arbitrary or capricious will courts interfere with its implementation. The court in Sanchez, supra, stated: "The legislature has delegated to the director of corrections broad authority to classify and discipline inmates within the jurisdiction of the department in order to maintain order and safety within Louisiana's prison system." 329 So.2d at 693.
Jurisprudence interpreting the federal constitutional prohibition against cruel and unusual punishment is very similar to state jurisprudence. Suffice it to say that the federal courts give state prison officials wide discretion in the operation of their prisons, and the federal courts will only interfere with prison administration when the conditions of confinement shock the conscience, are greatly disproportionate to *1321 the offense or offend notions of decency. See Procunier v. Martinez, 416 U.S. 396, at 404, 94 S.Ct. 1800 at 1807, 40 L.Ed.2d 224 (1974); Williams v. Edwards, 547 F.2d 1206 (5th Cir. 1977); Newman v. Alabama, 503 F.2d 1320 (5th Cir. 1974) at 1330 n. 14. See also U. S. ex rel. Walker v. Mancusi, 467 F.2d 51 at 53 (2nd Cir. 1972).
Given the standard of deference federal courts exercise toward state prison administrators plus the standard under the federal constitution for cruel and unusual punishment, there is no question that the regulation at issue in the case is not proscribed by the federal constitution.
The trial judge erred in holding the regulation unconstitutional. That portion of his judgment which declared the rule unconstitutional is therefore reversed.
In written reasons for judgment the trial judge held that the other Camp J rules complained of by plaintiff were constitutional. We agree with his decision as to these other rules and therefore affirm his judgment as to them.
DUE PROCESS
Plaintiff complains that his transfer from CCR to Camp J required a due process hearing because of his contention that Camp J is more punitive than CCR. The prison officials, however, contend that the conditions at CCR and Camp J are sufficiently similar so as to make the transfer a lateral one, accomplishable by administrative order without the need for a hearing.
The trial judge agreed with the defendants and denied plaintiff the relief he sought.
As noted earlier, plaintiff was confined to CCR prior to his transfer to Camp J. CCR is also a maximum security unit although inmates there have a few privileges not afforded to Camp J inmates, most notably the privilege of watching television. In most respects, conditions at the two facilities are similar.
Plaintiff's transfer to Camp J did not result in the loss of good time or in solitary confinement. (His loss of good time came as a result of a disciplinary hearing wherein he was found guilty of a rule infraction). His transfer was the result of an administrative decision to place him in maximum security extended lockdown, probably because of his propensity to escape and to break prison rules. He lost a few privileges as a result of the transfer, but the loss of privileges alone does not entitle a prisoner to a due process hearing under the Fourteenth Amendment. Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). Montanye v. Haymes, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976); see also Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).
Plaintiff's transfer to Camp J fell within the wide authority of prison officials to classify and discipline inmates. La.R.S. 15:853, 854. We are hesitant to raise to constitutional dimensions every transfer within a prison which may result in somewhat harsher conditions to an inmate. Only if a transfer or disciplinary action results in a grievous punishment, i. e., loss of good time or solitary confinement, should a due process hearing be held. Wolff v. McDonnell, supra. In other cases, prison officials should be given a certain amount of latitude to make and enforce rules necessary for the smooth and safe operation of their facilities.
DECREE
Therefore, for the above and foregoing reasons, the judgment of the trial court declaring the bed rest rule unconstitutional is reversed. In all other respects, the trial court judgment is affirmed, with the plaintiff to pay all costs of these proceedings.
REVERSED IN PART, AFFIRMED IN PART.